ALFRED R. TOOKER et al.

*v.*

WALTER J. VREELAND et al.

[Submitted December 14th, 1921. Decided February 5th, 1921.]

1. If a husband and wife make a compact to dispose of their combined estates. the terms of which are expressed in their mutual wills, the contract will be enforced in equity. Equity will not interfere with the probate of the wife's later will, made in violation of the contract, but will enforce the contract against her estate by impressing a trust upon the assets.

2. Such contract to be enforceable in equity must be founded upon a valid consideration certain and defined, equal and fair, and sufficiently proven.

3. Where the survivor, in such a case, accepts the benefit of the testamentary gift of the other, he becomes legally bound to carry out the obligation of the contract between them.

---

On bill, &c.

*Mr. William A. Lord,* for the complainants.

*Messrs. Collins & Corbin* and *Messrs. Coult & Woodruff,* for the defendants.

BACKES, V. C.

On January 15th, 1914, Reuben Tooker and Emeline, his wife, executed mutual wills, whereby they gave their respective estates to each other for life, and as much of the principal as necessary for his or her comfortable maintenance, with remainder over, in pecuniary legacies, and the residue to certain of their kin, share and share alike. The wills are identical except as to a few specific bequests of trinkets. The will of Mrs. Tooker contains a provision, which is not in that of her husband's, that

"the foregoing legacies [the pecuniary] in this paragraph set forth shall not be paid but shall lapse in case like legacies of like amounts are paid to the persons hereinabove named in this paragraph under the provisions of the last will and testament of my said husband, Reuben-Tooker."

Mr. Tooker died shortly afterward and his will was probated by his widow, his executrix, March 16th, 1914, before the surrogate of Essex county, and she took possession and enjoyed his estate until her death, June 5th, 1919. William A. Lord, co-executor, also qualified but took no active part in the administration of the estate during Mrs. Tooker's lifetime. Mrs. Tooker's mutual will was admitted to probate shortly after she died, and Alfred R. Tooker and William A. Lord, the executors therein nominated, duly qualified and entered upon the discharge of their duties. After her husband's death Mrs. Tooker made another will, June 16th, 1914; a codicil thereto February 27th, 1915; a second, May 3d, 1917, and a third February 26th, 1918, which have been offered for probate to the surrogate of Essex county, but have not been proved because of a stay issued in this suit. The assets of Mr. Tooker's estate are not sufficient to pay the pecuniary legacies of his will, and the complainants Alfred B. Tooker and Jennie Tooker, whose legacies under the mutual wills are substantially diminished by the second will and codicils

of Mrs. Tooker (Alfred R. Tooker's interest was reduced from a $10,000 legacy and one-seventh of the residue to a life estate in $8,000 and one-fourth of the residue, and Jennie Tooker's interest from $4,000 and a one-seventh of the residue to a life estate in $3,200), set up and charge that the mutual wills were made in pursuance of a contract between Mr. and Mrs. Tooker to bequeath to each other their respective estates for life, and to leave their combined estates, remaining at the death of the survivor, to the legatees agreed upon by them; that the mutual wills embody the terms of the contract, and they pray that the contract be specifically performed.

The law is well settled, and the proposition is not questioned, that if Mr. and Mrs. Tooker made a compact to dispose of their combined estates, the terms of which find expression in the mutual wills, the contract will be enforced in equity according to its established practice. Equity will not interfere with the probate of the later will, made in violation of the contract, but will enforce the contract against the estate of the survivor by impressing a trust upon the assets. There is a wealth of authority for the relief and the remedy. Many of the cases are gathered by Vice-Chancellor Garrison in *Deseumeur* v. *Rondel,* *76 N. J. Eq. 394.* The early English cases are *Dufour* v. *Pereira,* *1 Dick. 419; 2 Harg. Jur. Arg. 304; Lord Walpole* v. *Lord Orford, 3 Ves. Jr. 402.* See also for collection of cases *Stevens* v. *Myers, 91 Org. 114; 177 Pac. Rep. 37.* An interesting discussion of the subject is to be found in *Edson* v. *Parsons, 155 N. Y. 555.* See also *Rastetler* v. *Hoenninger, 136 N. Y. Supp. 961; Herman* v. *Ludwig, 174 N. Y. Supp. 469.* An early case in this state on the subject of enforcing contracts to bequeath is *Johnson* v. *Hubbell, 10 N. J. Eq. 332,* and the leading case is *Duvale* v. *Duvale, 54 N. J. Eq. 581; 56 N. J. Eq. 375.* See also *Lawrence* v. *Prosser, 88 N. J. Eq. 43.*

That such a contract be enforceable it must be, like all other contracts specifically enforceable in equity, founded upon a valid consideration, certain and defined, equal and fair, and sufficiently proven—qualities to which Lord Loughborough said in *Lord Walpole* v. *Lord Orford, supra,* he knew no limitations.

"The mutual wills do not on their face purport to be contrac-

tual. Their reciprocal provisions indicate that they were the result of an understanding between Mr. and Mrs. Tooker, but an understanding does not necessarily spell contract. The vital question is, Was it agreed by them that the wills should remain irrevocable after the death of either? For the solution of this we must look to the extraneous testimony, keeping in mind that, to establish an agreement, the proofs must be clear and convincing. The contract may be found in an express promise, or inferred, as a conclusion of fact, from the circumstances surrounding the parties.

Mr. and Mrs. Tooker were aged and childless. The estates about to be disposed of were earned by the husband. Whatever Mrs. Tooker had came from her husband, either by gift, or she held it in trust for him, and they evidently looked upon their holdings as common property. The actual amount left by either is unascertainable, because many of the securities found in the possession of Mrs. Tooker after her death bear no ear-marks of ownership, and whether they were held by her as executrix or in her own right could not be determined. The inventories appraising Mr. Tooker's estate at approximately $7,000, and that of Mrs. Tooker at $43,000, are conjectural.

Shortly before the wills were executed Mr. and Mrs. Tooker confided to a friend their purpose and understanding. This witness, intelligent and disinterested, whose word is unquestioned, and, as he seemed to me, trustworthy and dependable, gave cogent proof of the contractual nature of the arrangement. He testified that in the fall of 1913 (and that is about the time the couple were counseling with Mr. Lord, as hereafter shown),

"Mr. and Mrs. Tooker asked me if I would be an executor of their will; they said they wanted to draw up a joint will whereby they would agree that after the death of each other their wishes would be carried out one by the other. * * * They mentioned especially to me about their nephew Alfred Tooker. * * * They told me they wanted him to get the bulk of their estate; they said that they would leave him $10.000 outright and as residuary legatee, and wanted me to act as executor of such will with a Mr. Lord."

Mr. Lord, an esteemed member of the bar, and whose rectitude as a witness was conceded, testified that he was sent for to draw the wills, and I quote at length from his narrative:

"I went down there and found Mr. and Mrs. Tooker, who were introduced to me by Mr. Alfred Tooker, and Mr. Tooker said to me that he and his wife had agreed that they should make a will, and the question came up as to whether it should be a joint will or two mutual wills. In fact, their idea was to sign a joint will, and my advice given to them was that they better make two wills and have them executed at the same time. * * * His wife was there. He said that they wanted to dispose of their property according to their mutual desires; that they had talked the matter over and decided who they wanted to leave their property to. I asked Mr. Tooker, who owned the bulk of the property; 'Oh,' he said, 'that doesn't make any difference; we are both one—I and my wife are both one—what is hers is mine and what is mine is hers also—just as much hers as it is mine.' He said that he wanted to leave everything to her during her life; she wanted to leave everything to him during his life, and upon their death that the property be—go to certain designated legatees. He said that he wanted it to be a final disposition of the property and he did not care if it was in one will or two wills; and Mrs. Tooker—I don't know whether it was Mr. or Mrs. Tooker handed me this slip of paper specifying the legacies which they wanted placed within the will or wills. The paper was in the handwriting of Mrs. Tooker. * * * I then went back to my office and some days later produced to them a draft of two wills, one to be executed by each. The drafts of these wills which I now have in my possession. * * * They were to be the originals but there were some changes made in them afterwards. They took these drafts of the wills and kept them—they said they wanted to look them over—said that they might want to make some changes. And after—the thing drifted along for some months until January or—no—I don't know just when it was, but some weeks after these drafts were made, Mr. Tooker made certain changes in the amounts of the specified bequests as appears on this draft of Emaline F. Tooker's will, and then I redrew the wills in accordance with their instructions, and in January—January 17th, 1914—the wills were in proper shape to be executed, and I was present when they were executed in the presence of Mr. Everett and Mrs. Contrell, the subscribing witness. * * * On this original paper, which I said was in the handwriting of Mrs. Tooker, they made certain changes after it was first given to me, which appear in pencil in my handwriting. They wanted to leave their property to their relatives, whether they were relatives of Mr. Tooker or Mrs. Tooker, who were in need, rather than to some of the relatives on either side that were well fixed financially; and they discussed the matter considerably, and as I say over a period of some months before they were ready to execute, but Mrs. Tooker was very emphatic. She didn't want to do anything that was not the joint agreement and the consensus of opinion between her and her husband, and that they wanted this will when executed to be their last will and to effectually dispose of their property; and the question came up as to whether—in fact, I asked them, 'Supposing the estate or what property belonging to one is not sufficient to pay these legacies?' Well, they said, the legacies, of course, would all come out of the property belonging to the other; but Mr. Tooker was still insistent that their property—didn't want any of the property to be considered his or his wife's, but he wanted to dispose

of it as if it belonged to both of them, and for that reason the clause in Mrs. Tooker's will was inserted that if the bequests, which I think appear to be identical in both wills, were made out of Mr. Tooker's estate they should lapse and not be paid out of Mrs. Tooker's estate.  *  *  * I believe Mr. Tooker just said that he wanted it understood that this was the last will of both of them and that they were to be considered mutual wills, or some words to that effect, and I said I so understood it, and in my opinion it was better for them to execute two wills than to execute one will jointly. Mr. Tooker, on most of the interviews, did most of the talking, but Mrs. Tooker always assented to it and said she wanted everything arranged just as her husband, Reuben, wanted it, and wanted the property disposed of according to his wishes after he was dead."

Mr. Alfred R. Tooker, one of the complainants, testified in corroboration of the circumstances as detailed by Mr. Lord.

From this testimony, the truth of which is not challenged, it seems to me to be clearly and satisfactorily established that the wills grew out of, not simply the mutual desire of an aged and affectionate couple to gratify the other's wishes, but a solemn promise, an agreement—a contract—to be performed by the survivor. The consideration of the contract we readily find in the inducement held out by the one to the other to mutually testate, in the reciprocal gifts of the life estates, and the principal, if necessary, and the execution of the contract on the part of Mr. Tooker, by his unrevoked will at the time of his death. And in the acceptance and the actual enjoyment of the gift by Mrs. Tooker we also find that part performance which takes the oral contract out of the statute of frauds.

The disparity in the amounts of the estates involved does not militate against the conclusion I have come to that the mutual wills were the outcome of a contract. Equality of consideration is not essential to a binding obligation.

The apparent inequality introduces into the agreement no element of unfairness, affecting its enforceability, as the estates practically belonged to Mr. Tooker and were regarded by him and his wife as their common property.

It is argued that, inasmuch as the thing uppermost in the minds of the testators, as to their relatives, was to provide for those "who were in need," it was implied that the survivor could alter the gifts if and as the needs changed. . I cannot subscribe to this. It was an incident of their bargain and the two decided

that question—as to who "were in need"—definitely and irrevocably. Moreover, the breach of the contract cannot be justified upon any supposed readjustment by the second will and codicils of Mrs. Tooker, based upon changes in the financial conditions of the legatees, because, in fact, there were no changes, at least, none are shown. The case presents the second will and codicils as an arbitrary revocation by Mrs. Tooker of her mutual will and a declaration not to stand by the contract which produced it.

Unquestionably, Mr. and Mrs. Tooker's primary concern was each other, and it may well be that they would have provided, one for the other, in the manner they did, wholly thoughtless of a bargain; but be that as it may, the fact nevertheless is that they, in consideration of reciprocal bequests to themselves and those of their choice, bound themselves to abide the provisions of the mutual wills, and Mrs. Tooker having accepted the benefit of her husband's gift became legally and in conscience bound to carry out the obligations she undertook.

A decree will be advised enforcing the contract by impressing a trust upon the assets of the estate of Mrs. Tooker in the terms of the mutual wills, and to that end there will be an accounting.