36 N.J. Super. 212 (1955)
115 A.2d 144
VALENTINE GROMEK, PLAINTIFF-APPELLANT,
v.
FRANCES GIDZELA, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1955.
Decided June 21, 1955.
*213 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Elias A. Kanter argued the cause for appellant.
Mr. Robert J. Rubacky argued the cause for respondent.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff sued to enforce an alleged oral agreement between the late Valentine Gidzela and Frances Gidzela, his wife and defendant herein, to make mutual wills by whose terms plaintiff would benefit. She appeals from a Chancery Division judgment in defendant's favor.
*214 The complaint alleges that early in 1949 Gidzela and his wife entered into an agreement to make mutual and concurrent wills whereby each devised and bequeathed all his (her) property to the other if she (he) survived; that the agreement was made for plaintiff's benefit (just how is not explained), and on February 15 they executed wills pursuant thereto. The charge is then made that on or about August 7, 1953, while Gidzela was physically and mentally disabled, his wife procured the cancellation or destruction of the wills by artifice, deceit and fraud. Gidzela died August 19, 1953, and plaintiff claims defendant thereafter made one or more wills purporting to leave all her property to some person or persons other than plaintiff. She further alleges that defendant plans to transfer real estate of which she is seized, convert the proceeds to her own use and then give the money to persons other than plaintiff. Finally, she asserts that defendant intends shortly to depart the State. The complaint demands judgment declaring that defendant holds all her property in trust for plaintiff, and restraining her from making or attempting to make any disposition thereof except by devise and bequest to plaintiff.
The answer denies there was any agreement such as plaintiff describes. By way of counterclaim, defendant seeks recovery of the balance of a loan allegedly made to plaintiff. We are not concerned with the counterclaim; no appeal has been taken from the judgment entered thereon in defendant-counterclaimant's favor.
Among the matters stipulated by the parties at pretrial were: (a) there was no written agreement between defendant and her husband for the execution of mutual wills; (b) on February 18, 1949 they executed wills which had been drawn by defendant's present attorney; copies of the wills are no longer available; (c) on that date, and before actually drawing the wills, the attorney made a written memorandum of the details of the proposed testaments, which memorandum was admitted in evidence; (d) Gidzela died August 19, 1953; (e) following his death his will, dated August 7, 1953, was admitted to probate by the Hudson County Surrogate, *215 from which an appeal was taken; (f) by that will decedent left $50 each to plaintiff, her mother, husband and two children, and the residue to his wife, with the proviso that if she did not survive him the residue was to go to a Mrs. Lillian Granda; (g) since her husband's death defendant has made a will containing no provision for plaintiff.
As a result of information received through discovery proceedings plaintiff was permitted at pretrial conference to amend her complaint to allege that the agreement between Gidzela and his wife was that he would leave half his property to her if she survived him, and she in turn would leave half her property to plaintiff if her husband predeceased her. As will soon be observed, this allegation was no more accurate than the one set out in the original complaint.
The parties waived trial by jury. Plaintiff testified she was the niece of the late Valentine Gidzela, and named after him. He regarded her as a daughter. Her story was that on a visit to her home, just before Valentine's Day, February 14, 1949, her uncle told her, in the presence of her husband, her mother and defendant, that he and his wife had agreed on the will they were going to make; in her words, what was said was that "when my uncle died everything goes to his wife but when she dies half goes to my name and half goes to Mrs. Granda. And my aunt made [sic] the same will, that when she dies everything goes to my uncle but when he should die half goes to me and half to Mrs. Granda." (Mrs. Granda was a good friend of defendant.) Thereafter her uncle and aunt told her they had made the wills, but decedent never showed her a copy.
Plaintiff's only witness was her mother, decedent's sister. Her account of what was said on the occasion described by her daughter is:
"He said, `We going to make will. We both going to make will. Frances [referring to his wife] is all right [?]; you want to make will?' She say `Yes.' `For half when I die this all goes to my wife; when she die it goes to me, and we both it goes half to Mrs. Granda and half to Mrs. Gromek, my daughter.'" *216 Sometime in March 1949 defendant told her, "We make the will and we are very happy, like I told you before," and her husband confirmed this.
On direct examination defendant denied she was at plaintiff's home at the time the announcement about the proposed wills is said to have been made. She testified that neither she nor her husband had ever said in the presence of plaintiff or her mother that they intended to make wills, nor had they ever discussed the matter with them. Wills had been executed on February 18, 1949, but soon thereafter her husband said he was dissatisfied with the testamentary disposition made. On cross-examination defendant was asked whether the two of them had talked the matter over before signing the wills. She said they had. She was then asked, "And you agreed what you were to do?"  to which she answered "Yes." Further questioning elicited the information that during January 1949, when she was quite ill, her husband had suggested they make a will as soon as she recovered; that they briefly discussed the matter again on February 18 and then proceeded directly to the attorney's office where both wills were prepared, read, approved and executed. It was in March 1949 that decedent said he was not satisfied with his will and intended to change it. She changed her will on August 7, 1953, the same day he changed his. She admitted that she had since twice changed her will, the latest testament making no provision for plaintiff.
The memorandum made by the attorney before actually preparing the wills clearly indicates what each was to contain. Gidzela's was to provide that all his estate go to his wife, if living; and if she did not survive him, then to plaintiff and Mrs. Granda in equal shares. If plaintiff predeceased him, her share was to go to her mother. Defendant's will was to follow the same pattern, her husband being the primary beneficiary.
The trial judge held that plaintiff had failed to establish the alleged agreement and its terms by clear, cogent and convincing proof. At best, there was merely a favorable disposition by the Gidzelas toward plaintiff in February of 1949, *217 and any statements of favorable intention did not constitute a contract. The judgment under appeal followed.
Plaintiff introduced no testimony to support the allegations found in the complaint that defendant had procured the cancellation or destruction of the wills executed in February 1949 by "artifice, deceit and fraud" at a time when her husband was dying of cancer. The reason is that this charge had been the basis for plaintiff's attack upon the probate of the will  an attack which failed when the probate was upheld on appeal prior to the trial of this action.
There can be no question that decedent was favorably inclined toward plaintiff. However, more is required for her to succeed than the fact that she belonged to a category of persons who might possibly be the natural objects of decedent's affections and bounty.
The law is well-settled that where a husband and wife make an irrevocable compact to dispose of their combined estates, the terms of which find expression in mutual wills, equity will enforce their contract according to its established practice. In such a case equity does not interfere with the probate of a later will in violation of the agreement, but enforces the contract against the estate of the survivor by impressing a trust upon the assets. Tooker v. Vreeland, 92 N.J. Eq. 340 (Ch. 1921), affirmed o.b. 93 N.J. Eq. 224 (E. & A. 1921); Deseumeur v. Rondel, 76 N.J. Eq. 394 (Ch. 1909). In the language of the Tooker opinion, for such a contract to be enforceable "it must be, like all other contracts specifically enforceable in equity, founded upon a valid consideration, certain and defined, equal and fair, and sufficiently proven." And see Annotation, 169 A.L.R. 28 et seq.
We do not have the advantage of a written agreement between decedent and her husband for the execution of mutual wills. This, in itself, is not fatal to plaintiff's cause, although it makes her burden of proof so much the greater. Nor have the parties been able to produce the alleged mutual wills executed on February 18, 1949. We may proceed on the reasonable assumption that their provisions *218 accorded with the attorney's memorandum marked in evidence. Were we to reconstruct the mutual wills in this pattern, they would not on their face purport to be contractual. At best they would show that their reciprocal provisions reflected an understanding between the decedent and his wife  how they desired to testate. But, as Vice-Chancellor Backes observed in the Tooker case, an understanding concerning the making of wills does not necessarily spell out an irrevocable contract. The critical question still remains, Did they agree that the wills should remain irrevocable? In order to arrive at a proper answer to this question, we may consider extrinsic facts. An irrevocable contract is sometimes found in the express oral promises made between husband and wife. It is sometimes erected on the basis of an implied promise, inferred as a conclusion of fact from the surrounding circumstances. In any case, a parol agreement to execute irrevocable mutual wills is subject to close scrutiny. Such an agreement is permitted to stand only when established by evidence that is cogent, clear and convincing, leaving no doubt in the court's mind as to the parties actually having entered into such an arrangement. Tooker v. Vreeland, above; Minogue v. Lipman, 25 N.J. Super. 376 (Ch. Div. 1953), affirmed 28 N.J. Super. 330 (App. Div. 1953); cf. Richards v. Richards, 141 N.J. Eq. 579 (Ch. 1948); Ehling v. Diebert, 128 N.J. Eq. 115 (Ch. 1940), affirmed 129 N.J. Eq. 11 (E. & A. 1941). Plaintiff's proofs do not possess that quality and we therefore concur in the finding of the trial judge that she failed to establish an agreement that the alleged mutual and reciprocal wills be irrevocable. Close attention to what plaintiff and her mother claim was said by decedent and his wife, and a careful review and evaluation of all the facts and circumstances presented at the hearing, show that the proofs fall far short of establishing a testamentary arrangement irrevocable in nature.
The cases relied upon by plaintiff recite testimony and proofs clearly establishing an irrevocable agreement. They deal with a situation significantly different from the one before us: where a husband and wife executed mutual and *219 reciprocal wills pursuant to agreement, one died leaving his will untouched, and the survivor then executed a will different from the testamentary provision agreed upon. In such cases equity granted relief to parties who otherwise would have taken under the original testamentary pattern. Minogue v. Lipman, above; Sick v. Weigand, 123 N.J. Eq. 239 (E. & A. 1937); Tooker v. Vreeland, above. These cases proceed on the obvious ground that it would be unconscionable for the survivor to accept the fruits of a contract, retain the benefits, and thereafter violate the obligations thereof.
We have here defendant's uncontroverted testimony that soon after she and her husband had executed the wills on February 18, 1949, he expressed dissatisfaction with the testamentary arrangement and stated he would change his will. He did so on August 7, 1953, without objection on her part. In fact, she also changed her will on that day. This is supporting evidence for the view that although the Gidzelas may have initially agreed to execute mutual wills, neither of them looked upon the arrangement as immutable and irrevocable. Taken with the absence of any other strong indication of an intention of irrevocability at the time the wills were first drawn, we find no such case presented as would warrant reversal of the finding under appeal.
Affirmed.