105 N.J. Super. 184 (1969)
251 A.2d 470
EUSTACE WHITE AND ARNOLD TANNER, CO-EXECUTORS UNDER THE WILL OF THOMAS E. CATCHPOLE, DECEASED, PLAINTIFFS,
v.
JAMES WHITE, ROGER WHITE AND MARGARET W. TANNER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 19, 1969.
*185 Mr. Arnold Tanner, attorney for plaintiffs.
Mr. Daniel J. O'Hern for defendant James White (Messrs. Abramoff, Apy & O'Hern, attorneys).
Mr. William R. Blair, Jr. for defendants Roger White and Margaret W. Tanner (Messrs. Parsons, Canzona, Blair & Warren, attorneys).
*186 LANE, J.C.S.
This action was instituted by the executors under the will of Thomas E. Catchpole, deceased, to obtain a construction of his will executed November 25, 1953. Defendant James White, a grandnephew of decedent, is the devisee of a house and lot under paragraph Third. Defendants Roger White and Margaret Tanner are given an interest in the proceeds of a sale of the real property devised under paragraph Third. In addition, Roger White benefits under the residuary clause. These three persons are brothers and sister. The matter is before the court on final hearing.
Paragraph Third of the will provides as follows:
"I give, devise and bequeath to James White, son of my nephew, Eustace White, my house together with my furniture, except such antiques, linen and glassware as shall be selected and taken by Margaret Tanner, as provided hereinafter, located at 164 South Street, in the Borough of Eatontown, County of Monmouth and State of New Jersey. In the event my said grandnephew, James White shall sell said house within fifteen years after the date of my death, I direct that he shall give my grandniece, Margaret Tanner, and grandnephew, Rodger [sic] White, notice in writing of his intention so to do, and I further direct that he shall divide the proceeds from said sale equally between himself, said Margaret Tanner and said Rodger [sic] White, their heirs and assigns, per capita and not per stirpes.
(a) In the event said Rodger [sic] White has not attained the age of twenty-five (25) years at the time of the sale, said share so bequeathed to him shall be paid to my trustees for distribution to him in accordance with the provisions of the trust hereinafter provided for him."
The house referred to in that paragraph had been occupied by decedent as his residence for a number of years. The White family (parents of James, Roger and Margaret) lived one house away from the property. Mrs. Catchpole died in April 1953. There had been a close personal relationship between decedent and James White and his wife. James White acted as a son towards decedent. He and his wife did the shopping for him; they arranged for doctors; they were available whenever decedent needed help.
On January 12, 1968 a fire partially destroyed the premises. In that fire decedent received injuries from which he died on *187 January 26, 1968. During the interval between the date of the fire and the date of death, decedent did not have the capacity to change his will. At the time of the fire there was a policy of fire insurance covering the premises. A claim was made under the policy which was adjusted after Catchpole's death for $7,738.81, out of which $92.46 was spent for the protection of the premises. James White claims the insurance proceeds under paragraph Third. Roger White claims that the proceeds of the insurance policy constitute personalty, an entirely different asset than the house, and therefore should pass under the residuary clause.
Since the fire James White has repaired the house, incurring obligations in the neighborhood of $10,000 as well as contributing a substantial amount of his own labor.
Roger White relies primarily upon New York cases and particularly upon In re Wright's Will, 7 N.Y.2d 365, 197 N.Y.S.2d 711, 165 N.E.2d 561 (Ct. App. 1960). That case held that where personal property had been lost prior to testator's death, there was an ademption so that the legatee was not entitled to the insurance proceeds paid to the estate on account of the loss. The basis of the decision was given by the court as follows:
"As indicated above, we deal with the problem of ademption. Although, in the early days of our law, ademption was based on the intention of the testator, today in New York, as well as in many other jurisdictions, intention has nothing to do with the matter; the bequest fails and the legatee takes nothing if the article specifically bequeathed has been given away, lost or destroyed during the testator's lifetime." (197 N.Y.S.2d, at p. 711, 165 N.E.2d, at p. 562)
There is some support for the proposition that such was the law in this State at one time. Wyckoff v. Perrine's Ex'rs, 37 N.J. Eq. 118, 122 (Ch. 1883). Since that time, however, it has become clear that probable intent of the testator is the determining factor.
In In re Cooper's Estate, 95 N.J. Eq. 210 (E. & A. 1923), Chief Justice Gummere quotes with approval a rule laid down by the Supreme Court of New Hampshire:
*188 "In the case of Morse v. Converse, 80 N.H. 24, 113 Atl. Rep. 214, a decision of the supreme court of New Hampshire, Parsons, chief-justice, in discussing the doctrine of ademption, thus defines its scope: `A legacy which is specific is adeemed when the particular thing given is wholly lost or destroyed; or is disposed of by the testator during his life; or is so altered by him in its form as to indicate a change of testamentary purpose on his part, an intentional partial revocation of his will.' This, in our opinion, is an accurate statement of the law of ademption and of its limitations." (at p. 212)
The rule of nonexistence of the subject of a specific legacy at the time of death evidencing ademption was clearly labeled by Vice-Chancellor Berry as "but a rule of evidence." In Donath v. Shaw, 132 N.J. Eq. 545 (Ch. 1942), the vice-chancellor stated:
"In construing a will we start with the proposition that the intention of the testator as gathered from the language used is controlling unless contrary to law, or to public policy, which is a part of every law. That rule should be a constant guide to the end and the intention, if apparent, should control all presumptions and assumptions. The rule that the non-existence of the subject of a legacy evidences its ademption is but a rule of evidence, rebuttable by other evidence indicating that ademption was not intended." (at p. 549)
Testamentary intention is the criterion. In Arenofsky v. Arenofsky, 29 N.J. Super. 209 (App. Div. 1954), Justice (then Judge) Francis stated:
"The test of ademption of a specific legacy in this State is whether the subject is `lost, destroyed, or subsequently disposed of by testator, or so altered in form, by testator's subsequent acts, as to indicate a change of testamentary intent on his part. Conversely, if the subject, although somewhat changed in form, be not sufficiently changed to indicate change of testamentary intent, there is no ademption.' Chase National Bank v. Deichmiller, 107 N.J. Eq. 379, 382 (Ch. 1930); In re Cooper's Estate, 95 N.J. Eq. 210 (E. & A. 1923); Annotation, 16 A.L.R.2d 1404." (at p. 213)
Accord, In re Hall's Estate, 60 N.J. Super. 597, 600 (App. Div. 1960); Wyckoff v. Young Women's Christian Ass'n, 37 N.J. Super. 274, 278-279 (Ch. Div. 1955).
*189 Cases such as Righter v. First Reformed Church of Boonton, 17 N.J. Super. 407 (Ch. Div. 1952), having to do with the execution of a contract for the sale of premises specifically devised, are not applicable for the obvious reason that in such cases the testator has evidenced his intention for a testamentary change.
Here the partial destruction of the house did not occur through any voluntary act of decedent but rather as the result of an unfortunate accident. The mere fact that this fire occurred evidences no change in decedent's intention that James White was to receive the house in which decedent was living. It does not show that he intended that White receive the house partially destroyed by fire. It would be completely contrary to decedent's probable intent, as evidenced by paragraph Third of his will, to hold that by the unfortunate circumstance of the fire the proceeds of the fire insurance policy would fall into the residue. Fidelity Union Trust Co. v. Robert, 36 N.J. 561 (1962); 5 N.J. Practice (Clapp, Wills and Administration) (3d ed. 1962), § 255, n. 10 (1968 Supp.). The purpose of the proceeds was obviously to repair the house in the event of partial destruction by fire.
Where a testator has specifically devised real property upon which a house stands, which house is destroyed or damaged by fire before death and the testator dies without regaining capacity to indicate a contrary intention, the proceeds of fire insurance on the house replace the house and pass under the devise. Lee v. Honea, 349 S.W.2d 110 (Tex. Civ. App. 1961), application for writ of error refused, 163 Tex. 129, 352 S.W.2d 717 (Sup. Ct. 1961); In re MacDonald's Estate, 133 Cal App.2d 43, 283 P.2d 271 (D. Ct. App. 1955). Cf. Millville Aerie No. 1836, F.O. of E., v. Weatherby, 82 N.J. Eq. 455 (Ch. 1913). The proceeds of the insurance policy are payable to James White under paragraph Third.
James White contends that the provision in paragraph Third requiring that he divide with Margaret Tanner and Roger White, his brother and sister, the proceeds of any *190 sale made within 15 years after the decedent's death, is invalid as a restraint on alienation.
Paragraph Third gave James White an estate in fee simple. Galante v. Silverstein, 98 N.J. Eq. 52 (Ch. 1925). It then sought to have him give up two-thirds of the proceeds if the property is sold within 15 years.
In Magie v. German Evangelical Dutch Church, 13 N.J. Eq. 77 (Ch. 1860), affirmed o.b. 15 N.J. Eq. 500 (E. & A. 1862), Chancellor Green stated:
"An unlimited power of alienation is an inseparable incident of an estate in fee simple, and cannot be restrained by any provision or condition whatever. 1 Cruise's Dig., Tit. 1, § 53; 4 Cruise's Dig., Tit. 32, c. 23, § 1, 2; Co. Litt. 206, c. 223 a; Litt. § 360." (at p. 79)
Under this statement of the law the reasonableness of a restraint was immaterial. Any restraint was invalid.
There was some indication in Cornelius v. Den ex dem. Ivins, 26 N.J.L. 376, 385 (Sup. Ct. 1857), and in Feit v. Richards, 64 N.J. Eq. 16, 20 (Ch. 1902), that a limited or partial restraint might be valid. However, these indications were not followed in Battin v. Battin, 94 N.J. Eq. 497 (E. & A. 1923); Wrubel Realty Corp. v. Wrubel, 138 N.J. Eq. 466 (Ch. 1946), and Krueger v. Frederick, 88 N.J. Eq. 258 (Ch. 1917). See Annotation, 42 A.L.R.2d 1243 (1955).
As pointed out in 6 American Law of Property (A.J. Casner ed. 1952) § 26.2, the fundamental basis of the rule is a matter of public policy, i.e., to keep property alienable. Two of the important objections to restraints are their discouragement of improvements and their possible effect in respect to creditors of the owner of the property subject to the restraint. These objections are expressed in 6 American Law of Property, § 26.3, at pp. 413-414:
"Another evil growing out of a restraint is its effect to discourage improvements when it is imposed upon an interest in land. A landowner will be reluctant to make improvements upon land that he cannot sell during the period of restraint, which may be a long term *191 of years, or even his whole life. In many instances, therefore, the restraint deters the owner of land from obtaining the maximum enjoyment of it; it may also retard the development of a particular section of the community and prevent the increase in taxable values which would otherwise naturally occur. This effect of the restraint to prevent the utilization of land in the most effective manner is unquestionably one of the most vital objections that can be urged against the validity of the restraint. If a substantial portion of our land were subject to restraints upon alienation, the resultant effect upon social and economic life would be serious.
The concluding argument against the validity of a restraint is based upon its possible effect in respect to creditors of the owner of the property subject to the restraint. Restraints commonly appear to be directed primarily against voluntary transfer by act of the owner of the property affected. In many instances, however, the restraint may expressly or impliedly apply to cases of involuntary transfers, such as execution sales, foreclosure sales, etc. Insofar as the restraint may operate to prevent a creditor from resorting to the property of his debtor for satisfaction of his claim, it works an obvious hardship upon him. While a creditor may not rely definitely upon the debtor's ownership of particular property as a specific means for payment of his demand, he undoubtedly is influenced in extending credit by the general reputation of the debtor as a person of financial ability, and by the appearance of prosperity that the latter's enjoyment of property enables him to sustain. A system of restraints which permits a debtor to continue in the enjoyment of the benefits of property of substantial value, and at the same time to refuse payment of his just debts, does not commend itself to the ideas of moral justice entertained by a considerable portion of society. Such a system of restraints may undermine popular confidence in our whole legal scheme."
The type of restraint before the court was discussed in 6 American Law of Property, § 26.68, at p. 513:
"Occasionally, however, they require payment to a third person, and do not contain an express clause of forfeiture. In this type of case, they should be construed to create either covenants to pay or conditional equitable charges upon the lands. Considering such a provision to create an equitable charge, conditioned upon alienation, its actual nature and effect become more apparent. It amounts virtually to a gift over of a partial interest in the land upon alienation; it differs only in degree from a complete gift over, and should, therefore, be void. If land has been conveyed with reservation of a rent charge, any provision increasing the rent upon alienation of the land is void, since it has the same effect as a provision requiring payment of a portion of the sale price upon transfer."
*192 Although here the owner of the fee has expended his own sums to improve the property, the effect of the provision in the average case would of necessity be to discourage improvements. It is doubtful whether the fee owner could obtain a mortgage because of the uncertainty of the correct construction of the provision for division. Suppose credit was extended to James White and thereafter James White defaulted and a judgment was obtained against him. Under an execution sale, would two-thirds of the proceeds go to people other than James White, thereby substantially reducing the amount available to the creditor? Surely such a situation is against public policy.
This State adheres to the policy of favoring alienation of property and its ready marketability. Highway Holding Co. v. Yara Engineering Corp., 22 N.J. 119, 133 (1956). The provision in paragraph Third of the will for a division of the proceeds upon a sale within 15 years is invalid. Dunlop v. Dunlop's Ex'rs, 144 Va. 297, 132 S.E. 351 (Sup. Ct. App. 1926); Wieting v. Billinger, 50 Hun 324, 3 N.Y.S. 361 (N.Y. Sup. Ct. 1888); In re Surovy's Will, 215 N.Y.S.2d 845 (Sur. Ct. 1961). Even if the law in New Jersey today were that a restraint of this nature is valid if it is reasonable under the circumstances (see Brace v. Black, 51 N.J. Super. 572 (App. Div. 1958), certification granted 28 N.J. 349 (1958) as to preemptive provisions), the restraint in this case would not be valid. It is unreasonable for the reasons referred to above. In this day and age of rapidly changing neighborhoods the provision could very well cause the owner to refuse to sell even though a sale would be of great benefit to the community. As pointed out, here the owner has put substantial funds of his own into the property. Certainly it would not be equitable to have two-thirds of those sums go to others upon a sale within 15 years.
It is argued by Roger White and Margaret Tanner that because of an in terrorem clause contained in the will, James White should take nothing. Paragraph Thirteenth of the will provides:
*193 "In the event that any provision of this, my last will and testament, is contested by any of the parties mentioned herein, the portion or portions of the estate to which such party or parties would be entitled shall be disposed of in the same manner as though their name or names had not been mentioned herein."
Their position is not well taken. In Bottomley v. Bottomley, 134 N.J. Eq. 279 (Ch. 1944), Vice-Chancellor Woodruff stated:
"Although decisions of the courts of the several states reflect a lack of uniformity touching the enforcement of no-contest provisions, the clear weight of the authorities exempts from forfeiture a beneficiary who participates, in invitum, in proceedings for construction only." (at p. 298)
In terrorem clauses are strictly construed against a forfeiture. Marx v. Rice, 1 N.J. 574, 587 (1949). Here James White is before the court in invitum in a proceeding for the construction of a particular paragraph of the will. The fact that he has raised a question as to the legality of a provision of that paragraph and that the court has held such provision to be against public policy does not result in a forfeiture of his interest. 6 N.J. Practice (Clapp, Wills and Administration) (3d ed. 1962), § 665, p. 217, n. 17. If the question of the validity of the restraint had not been raised by James White after he was brought into court by the executors seeking a construction of the paragraph containing the restraint, it might have been overlooked and the resultant decision approving sub silentio the restraint looked to by attorneys drawing wills in the future as some indication of the validity of such a restraint.