663 A.2d 132

IN THE MATTER OF THE ESTATE
OF MAX RESNICK, DECEASED.

PAUL HELLER AS EXECUTOR OF THE ESTATE OF MAX RESNICK, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. MARK RESNICK, DAVID RESNICK, ANNA RESNICK AND SELMA RESNICK, DEFENDANTS–RESPONDENTS, AND SELMA RESNICK, DEFENDANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 28, 1994—Decided August 31, 1995.

48

Before Judges GAULKIN, BAIME and KESTIN.

*Lewis Stein* argued the cause for appellant/cross-respondent (*Nusbaum, Stein, Goldstein & Bronstein,* attorneys; *Mr. Stein* and *Cynthia C. Stilwell,* on the brief).

*Sheldon H. Altwarg* argued the cause for respondent/cross-appellant Selma Resnick (*Sussman & Altwarg,* attorneys; *Mr. Altwarg* and *Harriet Heuer Miller* on the brief).

*Ralph Neibart* argued the cause for respondents Mark, David and Anna Resnick (*Mr. Neibart,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

The issues raised in this case bear upon the interests of those affected by a written contract to make reciprocal wills, specifically the restraints upon the freedom of action of a party in using or disposing of assets during his life as a survivor, and the enforceable expectations of irrevocable beneficiaries who are residuary legatees. These are questions of first impression, although touched upon in earlier cases involving oral testamentary contracts.

In January 1973, Max Resnick and Ada Heller were married. Max [1] was about 63 years of age and Ada was about 57. Each had been married before. Max had two adult children, Jerome and Charles. Ada had three adult children, Paul, Jean and Robert. Paul is the plaintiff executor herein.

Ten years after their marriage, on February 3, 1983, Max and Ada agreed, in writing, to make irrevocable reciprocal wills. *N.J.S.A.* 3B:1–4. Except for purely formal matter, the contract, in its entirety, provided:

WHEREAS, the Husband and Wife have been married since January 18, 1973; and

WHEREAS, the parties have combined the assets they each brought the marriage; and

WHEREAS, the parties have agreed to execute Wills in the forms annexed hereto and made a part hereof, designated Exhibits "A" and "B"; and

WHEREAS, each party has agreed not to alter or revoke any of the provisions of his or her Will without the written consent of the other; and

WHEREAS, the parties have agreed not to exclude the children of the other party by executing a new Will upon the death of either the Husband or Wife,

NOW, THEREFORE, for and in consideration of the sum of ONE (1.00) DOLLAR and other good and valuable consideration, it is agreed as follows:

1. The Husband shall execute a Will in the form annexed hereto and marked Exhibit "A".

2. The Wife shall execute a Will in the form annexed hereto and marked Exhibit "B".

3. After the due execution of their respective Wills in the forms of Exhibits "A" and "B", neither the Husband nor the Wife shall alter or revoke any of the provisions of his or her respective Will without first obtaining the written and acknowledged consent of the other.

4. Upon the death of either the Husband or Wife, the survivor agrees not to alter or revoke any of the provisions as contained herein, inasmuch as each of the parties has provided for the children of the other party.

5. This agreement may not be altered in any manner except by written instrument duly executed and acknowledged by both parties.

6. This agreement shall be binding upon and inure to the benefit of the respective parties hereto and to their respective heirs and assigns.

---

[1] Necessarily, to avoid confusion, we refer to the decedents and the parties by first name.

The wills executed the same day designated Max and Ada as each other's sole heirs and provided that the children of both would be the residuary heirs of each. If any child of Max or Ada predeceased the parent, that child's share would devolve upon the offspring of that child.

Some two years later, on April 24, 1985, after more than twelve years of marriage, Ada died. Max was appointed as executor of her will. He filed an inheritance tax return reporting a net estate of $97,495.60.

In June 1986 Max, then about 76 years old, married Selma Cagin, aged 68, a widow with three adult children. They had met in September 1985. A month before his marriage to Selma, Max sold for $168,000 the condominium apartment in which he resided, previously owned by him and Ada by the entireties.

Also in June 1986, Ada's children filed suit seeking to compel discovery concerning the condition of their mother's estate and to obtain an accounting. On December 1, 1986, the relief sought was denied without prejudice.

Max and Selma resided in her condominium in West Orange and purchased another condominium in Hallandale, Florida for $122,500. The Florida property was initially purchased with funds belonging to Max. Shortly thereafter, Selma reimbursed Max for half the purchase price. They also purchased, from joint funds, for the Florida condominium, a $7,000 piano and other items. In November 1986, Max also bought a new Cadillac automobile for $20,201.

After they married, Selma, at Max's request, revised her will bequeathing him a life estate in her West Orange condominium. Also, on Max's recommendation, Selma gave her interest in a pharmacy business and associated real estate to one of her sons.

For the nearly two years from their marriage to Max's death on May 18, 1988, Max and Selma divided their time between their residences in West Orange and Hallandale. Selma continued to pay the carrying costs of the West Orange residence as she had

before Max moved in, and she usually paid for their groceries. All other expenses of the couple were paid from their joint resources. They dined out three or four times per week and gambled in Atlantic City at least twice each week when they were in New Jersey.

Some of their respective property became intermingled; other resources were maintained individually. They opened joint bank accounts and deposited their social security income therein. From time to time, other funds were transferred from one spouse's accounts to the other's or to joint accounts. Purchases of stocks and bonds were made, with the securities being placed in the name of one spouse or the other, but not necessarily that of the spouse whose assets had funded the purchase.

In March 1986, a few months before Max and Selma were married, Max's son, Jerome, committed suicide. Max was executor of Jerome's will and claimed to be a creditor of Jerome's estate. The basis of the claim was a mortgage on Jerome's home in Connecticut securing an alleged debt in excess of $90,000 at the time of Jerome's death, representing the aggregate of a series of loans made to Jerome by Max between 1964 and 1985. In probate proceedings in Connecticut, Jerome's widow, Jessica, contested the debt, contending that the amounts given by Max to Jerome had been gifts with no expectation of repayment. She contended further that because of strained marital relations between her and Jerome, with divorce a possibility, the monies were paid over to Jerome by Max in a manner contemplated to avoid claims Jessica might have against Jerome in respect of the marital estate were a divorce to occur. After some inquiry by the Connecticut probate judge, Jessica and Max agreed that the funds would be provided to Max's grandchildren, Anna, David and Mark Resnick, Jerome and Jessica's children, for use in payment of college tuition and expenses, and that Max, accordingly, was to receive the funds in trust for the grandchildren. In December 1987 and January 1988, two payments of principal and interest totalling about $101,000 were made to Max by Jerome's estate and were deposited in one

of Max's bank accounts. In April 1988, the funds were used to acquire three Franklin Federal tax free certificates, each in the name of one of the grandchildren and Selma as joint owners.

Selma was unaware of the existence of Max's and Ada's reciprocal wills or the related contract. When Max died, she searched for a will but found none. She consulted with Max's attorney to determine whether he knew of a will. He did not,[2] and he assisted Selma in filing papers on June 3, 1988 to qualify as administrator of Max's estate. Selma assumed that all of Max's property had passed to her, and she began treating the assets of Max's estate as if she owned them.

As a consequence of a complaint and order to show cause filed in August 1988 by the heirs under the will, the trial court revoked Selma's letters of administration, restrained alienation of all assets passing under the will, and appointed Paul Heller as executor of Max's estate. Issue was joined in a timely fashion. In an amended pleading filed in March 1991, however, Selma counterclaimed for an elective share of Max's estate pursuant to *N.J.S.A.* 3B:5–15a. Eventually, the executor filed a separate complaint seeking vacation of the 1988 transfers to Max's grandchildren effected in the three tax free certificates on which Selma was designated as joint owner. The action against the grandchildren and Selma was consolidated with the probate action.

Trial commenced with a focus on the cause of action concerning the transfers to the grandchildren. After the close of plaintiff's case on those claims, the trial court dismissed the action, holding that "the [three] joint accounts by definition were not assets of the estate," and that their establishment did not violate the contract for irrevocable reciprocal wills.

---

[2] The contract and reciprocal wills had been prepared by a different attorney. In September 1987, Max consulted that attorney and was advised that, because of the terms of his contract with Ada, Max could not change his will; but that the moneys he had inherited from Ada were his "to live on or to do with as you wish during your life, in that the heirs would have no claim until you should pass[.]"

Two additional days of trial ensued in respect of the remaining issues bearing upon alleged assets of Max's estate. Findings were made based upon the proofs, as a consequence of which the trial court ordered Selma to turn over certain assets to the estate: a $15,000 New Jersey Health Care Facility bond, a $10,000 Atlantic County Improvement Authority bond, 500 shares of Bankamericorp stock, $28,315.15 in income from assets belonging to Max less whatever federal and state income taxes had been paid on that income, and the Cadillac or cash representing its appraised value.

Some of the relief sought was denied. Specifically, Selma was permitted to retain a New Jersey Turnpike bond in her name, 6,471 shares of Franklin Federal Tax Free Income Fund, the proceeds of a $5,000 Union Electric bond, and full title to the Florida condominium. The estate's claim to a gold Rolex watch, a blue sapphire ring, and a diamond pinky ring was also denied along with its demand for a surcharge on Selma for the manner in which she had handled the funds that Max had turned over to her to invest and hold for his grandchildren.

Selma's counterclaim for an elective share was denied. Her application for counsel fees and costs was granted with an award of $15,645.95.

The estate appeals from the dismissal of the claims involving Max's grandchildren and all other portions of the judgment except the provisions denying Selma's elective share claim and ordering turnover of the New Jersey Health Care Facility bond, the Atlantic County Improvement Authority bond and the 500 shares of Bankamericorp stock. Selma cross-appeals from that portion of the judgment denying her an elective share in Max's estate.

This case does not present issues concerning the validity or enforceability of the written contract to make wills, questions essentially beyond dispute if required formalities have been observed and consideration exchanged. *See N.J.S.A.* 3B:1–4; *Estate of Cosman,* 193 *N.J.Super.* 664, 475 *A.*2d 659 (App.Div.1984); 5 *New Jersey Practice, Wills and Administration,* § 22 (Alfred C.

Clapp & Dorothy G. Black) (rev.3d ed.1982) and cases cited therein.

Legal issues typically arise when a party to a testamentary contract, as survivor, acts to dispose of property covered by the agreement in a manner arguably different from that contemplated. Contracts providing for reciprocal wills are a primary subset of the general topic. *See* Phillip E. Hassman, Annotation, *Right of Party to Joint or Mutual Will, Made Pursuant to Agreement as to Disposition of Property at Death, to Dispose of Such Property During Life,* 85 *A.L.R.*3d 8 (1978). Historically, oral agreements of this type have posed especially troublesome problems. *Ibid.* Rules and approaches have developed, by which courts, on the basis of parol evidence, have found such contracts to exist and have construed the intentions of the parties based upon the circumstances established in each case. The enactment of *N.J.S.A.* 3B:1-4 changed matters in a basic way. The statute, essentially identical to § 2-514 (formerly § 2-701) of the Uniform Probate Code, provides:

> A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if executed after September 1, 1978, can be established only by (1) provisions of a will stating material provisions of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.

With this prescription of "only" three ways in which such contracts may be proved, purely oral agreements unmentioned in attendant wills became, generically, unenforceable. *Estate of Cosman, supra,* 193 *N.J.Super.* at 670, 475 *A.*2d 659. It follows that the principles and methods for determining the existence of an oral contract and its scope are of limited utility in a case such as this. Where, as here, the parties have entered into a written testamentary contract, a court need not divine, based solely on parol and circumstantial evidence, what the underlying motivations and intendments of the parties were. It is the terms of the agreement—what it contains and what it omits—that control. To the extent interpretive guidelines are helpful in arriving at an

understanding of what such a contract permits or prohibits, we may find assistance in neutral principles of law disfavoring restraints on alienation of property, *see Brace v. Black,* 51 *N.J.Super.* 572, 580–82, 144 *A.*2d 385 (App.Div.1958); *Ierrobino v. Megaro,* 108 *N.J.Super.* 556, 560, 262 *A.*2d 17 (Ch.Div.1970); *White v. White,* 105 *N.J.Super.* 184, 190–92, 251 *A.*2d 470 (Ch.Div.1969); forfeitures, *see Lehigh Valley R.R. Co. v. Chapman,* 35 *N.J.* 177, 188, 171 *A.*2d 653, *cert. denied,* 368 *U.S.* 928, 82 *S.Ct.* 364, 7 *L.Ed.*2d 192 (1961); and implied limitations on title, *see N.J.S.A.* 3B:3–39; *Tzeses v. Tenez Constr. Co.,* 97 *N.J.Eq.* 501, 503, 128 *A.* 388 (E. & A.1925); *Den ex dem. Bolton v. Bowne,* 18 *N.J.L.* 210, 211, 214 (Sup.Ct.1841); *cf. N.J.S.A.* 3B:3–40.

◼ In analyzing the issues presented concerning the rights and duties of the parties and the intended beneficiaries in this case, we begin with the wisdom imparted by the second Justice Harlan.

In order to lay hands on the precise issue which this case involves, it is useful first to canvass various matters which this record does *not* present.
[*Cohen v. California,* 403 *U.S.* 15, 18, 91 *S.Ct.* 1780, 1784, 29 *L.Ed.*2d 284, 289 (1971).]

This is not a case in which the parties established express limitations of any type on the freedom of the survivor to use or deal with the property involved. There is no provision restricting transfers during their joint lives, or by the survivor after the death of one of them. Neither is there any provision expressly permitting transfer, nor any stated designation of the quality of ownership to be enjoyed by the survivor, *i.e.,* whether unconditional or limited, such as to a life estate.

No types of transfers are expressly forbidden; nor is any particular item of property, real or personal, dealt with specifically. There is no differentiation in treatment between classes of property, such as that acquired by succession from the other party as distinguished from property independently owned by the survivor before the death of the other party or acquired by him or her after the other party's death. Except for a manifest intention to treat all children (and their issue, *per stirpes* ) of both parties

equally, the contract and the wills executed pursuant thereto are silent concerning the use to which the survivor may validly put the property during his or her lifetime, and make no mention whatsoever of the possibility of remarriage.

What this case does involve is a simple contract by the parties to execute reciprocal wills of irrevocable character; and equally simple wills in which the parties were each other's sole heirs with the children of both as equal residuary legatees of each. In the absence of additional express language, neither the contract nor the wills can be seen as having any other meaning, quality or limitation. There are lines of cases dealing with oral agreements in which courts have construed circumstances to suggest that the parties intended the survivor to enjoy less than full ownership of the property, or to require, by way of remedial device, the imposition of constructive trusts for the benefit of irrevocable beneficiaries. *See, e.g., Minogue v. Lipman,* 28 *N.J.Super.* 330, 100 *A.*2d 684 (App.Div.1953); *Sick v. Weigand,* 123 *N.J.Eq.* 239, 197 *A.* 413 (E. & A.1938); *Tooker v. Vreeland,* 92 *N.J.Eq.* 340, 112 *A.* 665 (Ch.), *aff'd o.b.,* 93 *N.J.Eq.* 224, 115 *A.* 255 (E. & A.1921). *Contra Galloway v. Eichells,* 1 *N.J.Super.* 584, 62 *A.*2d 499 (Ch. Div.1948). *See generally* Hassman, Annotation, *supra,* 85 *A.L.R.*3d 8. As we have already observed, these cases are of limited precedential value in understanding expressed terms in a written contract. Here, it is the agreement itself that establishes the interests involved. No particularized facts were developed to qualify what the contract and wills provide on their faces—that the survivor in the arrangement was to enjoy the property to which he or she succeeded without significant limitation or condition, and was required, only, to leave what remained for equal distribution among the designated beneficiaries.

We cannot know and will not speculate about Max's and Ada's conscious intentions in entering into the contract. It may be that they intended to preserve their respective assets to the greatest extent possible for the ultimate benefit of their children. It is no less likely that their only design was the equal treatment of all the

children of both in respect of whatever might pass on the death of the survivor. Or, they may have had something else in mind. We can be guided only by the terse language of the contract, complete in itself, especially since there are no proofs of any consequence in the record that illuminate the underlying intentions of Max and Ada. Faced with such instruments as Max and Ada executed, fully effective and dispositive on their faces, it would be presumptuous for us to see Max and Ada as having intended any consequence other than that articulated by them.

Only four sets of conclusions can be confidently drawn on this record concerning the contract at issue. The trial court drew all four. First, the parties intended that their reciprocal wills should be irrevocable. In the absence of any mutual agreement during the lives of both of the parties to modify the contract or the wills, the terms of Max's will became immutable upon Ada's death. Second, the parties intended no special limitations or disabilities on how each might, during life, use the property he or she inherited from the other; for if any such had been intended some express provision would have been made in the contract. *Cf. Krueger v. Frederick*, 88 *N.J.Eq.* 258, 259, 102 *A.* 697 (Ch.1917). Third, the parties to the contract, Max and Ada, intended that all of the children of both should be treated equally when inheriting from the survivor. Fourth, once Max died, his property passed under the irrevocable will and Selma succeeded to no part of it, save what might come to her by operation of law, *N.J.S.A.* 3B:5–15, :8–1 to –19.

This is not to say that, in the absence of any written provision confining the survivor's freedom of action in dealing with the property, a court should never set aside a transfer intentionally made for the purpose of derogating the clearly established rights and interests of residuary legatees in irrevocable reciprocal wills. Where the proofs are adequate, the courts have ample equitable and legal power to protect the beneficiaries against such bad faith conduct designed to frustrate the contract. *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.2d* 522 (1965). We are in

substantial agreement with the trial court that no adequate evidence existed in this record upon which such a result could have been based.

The trial court's findings and conclusions are in every respect supported by substantial evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). Only those assets that were ordered to be turned over to the estate had been established to have belonged to Max at the time of his death, passing to the residuary legatees under his will.

Plaintiff failed to sustain his burden of proof with regard to those assets in respect of which the relief sought was denied. As to some, there was no adequate showing that the assets or the funds used to purchase them belonged to Max rather than to Selma. As to others, proof of the existence of the assets was inadequate. And, as to still others, there was no basis, either in the facts or in the contract between Max and Ada, for placing restrictions on Max's use of his inheritance from Ada along with his own property in pursuit of a reasonable lifestyle, including remarriage and the sharing of resources with a new spouse, as in the rather conventional decision to purchase real estate by the entireties with funds provided by both. Finally in this regard, there was nothing in the agreement that can reasonably be seen as precluding Max from compromising his claim against Jerome's estate in the face of Jessica's contentions, and assuming the role of trustee for his grandchildren with respect to the disputed funds. We are in substantial agreement with the trial court's reasons for concluding that the funds so generated did not become assets belonging to Max or, ultimately, to his estate.

In order to reach a contrary conclusion as to any of the foregoing elements of the case, we would need to recognize a presumption in favor of the residuary legatees. We have been given no good reason to do so, either as a matter of legal policy or otherwise.

█ The trial court's award of counsel fees to Selma was within the scope of *R.* 4:42–9(a)(2) and (3). We discern no abuse of discretion in the court's decision to make such an award or in its determination of the amount awarded.

█ Selma did not file a complaint for an elective share within the six months required by *N.J.S.A.* 3B:8–12, nor did she make a timely application for an extension. Her claim, now embodied in the cross-appeal, is based solely on the operation of *N.J.S.A.* 3B:5–15a, which provides:

> If a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse shall receive the same share of the estate he would have received if the decedent left no will *unless it appears from the will that the omission was intentional* or the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence. (emphasis supplied).

To the extent this provision confers rights upon a surviving spouse independent of those established in *N.J.S.A.* 3B:8–1 to –19, *cf.* David Carl Minneman, Annotation, *Surviving Spouse's Right to Marital Share as Affected by Valid Contract to Convey by Will,* 85 *A.L.R.*4th 418 (1991), we are in substantial agreement with the trial court's reasoning in its oral decision of July 6, 1992, that the existence of an irrevocable will passing the whole of an estate to designated beneficiaries, as the product of a contractual reciprocal will arrangement, is adequate to establish the requisite expressed intent to omit a surviving subsequent spouse. The will and its attendant contract must be read *in pari materia.* Under the contract, Max had no ability to make a testamentary devise at variance with his irrevocable will. He must be presumed to have intended the consequences of his agreement with Ada. *See Adkins v. Oppio,* 105 *Nev.* 34, 769 *P.*2d 62 (1989).

Affirmed.