NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1948-17T4

RICHARD CAPPARELLI,

      Plaintiff-Appellant,

v.

MATT LOPATIN,

      Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**June 25, 2019**

**APPELLATE DIVISION**

Submitted February 25, 2019 – Decided June 25, 2019

Before Judges Messano, Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000153-17.

Paul V. Fernicola & Associates, LLC, attorneys for appellant (Paul V. Fernicola, on the briefs).

Saiber LLC, attorneys for respondent (Andrew S. Kessler and John M. Losinger, on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Plaintiff and defendant are former business partners. When their business relationship deteriorated amidst dueling accusations of misconduct,

they engaged in extensive litigation in Florida and New Jersey related to winding down their companies, Direct Wholesale, Inc.[1] and Unlimited Pins, LLC[2] (the companies).[3] On May 2, 2013, they entered into a global settlement agreement (May 2013 agreement) that settled the pending lawsuits and established a mediation/arbitration mechanism to resolve any disputes encountered during the parties' wind-down[4] efforts. Under the mediation/arbitration mechanism, disputes would first be submitted for informal mediation to Michael Marotte, Esq., who had served as the companies' corporate counsel for about ten years. If Marotte was unable to resolve the dispute, then the dispute would be submitted for binding arbitration to a panel of three arbitrators (the three-person panel).

The three-person panel consisted of one arbitrator chosen by each party and Marotte, who served as the neutral arbitrator. In this role, Marotte could

---

[1] Plaintiff and defendant were the only two shareholders in Direct Wholesale, Inc.

[2] Plaintiff and defendant were the co-managing members of Unlimited Pins, LLC.

[3] Plaintiff and defendant had business interests in other companies not directly involved in this appeal.

[4] The May 2013 agreement described "[t]he [w]ind-[d]owns" to "include payment of all outstanding bills and debts to vendors and creditors prior to distribution[s] to [the parties]."

withdraw at any time and was subject to dismissal by either party in the party's sole discretion. In that event, a replacement neutral third arbitrator would be selected by the two remaining arbitrators. The parties executed an arbitration agreement on August 8, 2013, and a superseding agreement on March 16, 2015 (collectively, arbitration agreement), to ratify and effectuate the May 2013 agreement. The arbitration agreement, among other things, specified that the arbitration procedure was governed by the New Jersey Uniform Arbitration Act (the Act), N.J.S.A. 2A:23B-1 to -32. The arbitration agreement also waived the provision of the Act prohibiting an individual with a "known, existing, and substantial relationship with a party" from serving as a neutral arbitrator, N.J.S.A. 2A:23B-11(b), and permitted each arbitrator to bill for services at an hourly rate of $600.

Over time, the mediation/arbitration mechanism proved expensive and posed numerous scheduling difficulties for the three-person panel. As a result, on May 28, 2015, the parties entered into another settlement agreement (May 2015 agreement), naming Marotte as the sole decision maker responsible for resolving disputes between the parties related to the collection of outstanding debts owed to the companies. Thereafter, on July 23, 2017, plaintiff dismissed Marotte as the neutral arbitrator on the three-person panel as permitted under the May 2013 agreement. The following month, Marotte's partner informed

the parties that Marotte could no longer serve as the decision maker under the May 2015 agreement.

When the parties were unable to agree on a replacement for Marotte, in September 2017, plaintiff filed an order to show cause and verified complaint against defendant, seeking to compel the appointment of a replacement for Marotte to adjudicate the collection disputes pursuant to the May 2015 agreement. Defendant filed a contesting answer and asserted various affirmative defenses, including invoking "the doctrines of frustration of purpose and impossibility" in order to void the May 2015 agreement. Defendant's pleading also included a counterclaim for declaratory judgment, requiring the two remaining arbitrators on the three-person panel to select a replacement for Marotte in accordance with the May 2013 agreement, or, in the alternative, requiring the court to select a replacement to resolve the remaining wind-down disputes.

After granting plaintiff's motion to proceed as a summary proceeding pursuant to N.J.S.A. 2A:23B-7 and Rule 4:67-1(a),[5] the trial judge conducted a plenary hearing "on the sole issue of the parties' state of mind and intention when they entered into the May 2015 [a]greement and selected . . . Marotte to

_____

[5] Defendant cross-moved to proceed summarily on his counterclaim only.

resolve the outstanding collection disputes[.]" During the hearing, the judge heard testimony from the parties, but refused to hear testimony from Marotte. On December 8, 2017, the judge entered an order, declaring the May 2015 agreement "null and void[,]" relegating the parties to the arbitration agreement to resolve the remaining disputes, and dismissing the complaint and counterclaim without prejudice.

Plaintiff now appeals from the December 8, 2017 order, raising the following points for our consideration:[6]

> POINT I - THE TRIAL [JUDGE] ERRED IN PREVENTING MICHAEL MAROTTE, ESQ. FROM TESTIFYING DURING THE HEARING AS TO HIS KNOWLEDGE OF THE PARTIES' INTENT IN ENTERING THE [MAY] 2015 AGREEMENT[.]
>
> POINT II - THE TRIAL JUDGE ERRED IN VOIDING THE ENTIRE [MAY] 2015 . . . AGREEMENT BASED UPON THE LANGUAGE OF THE AGREEMENT ITSELF[.]
>
> POINT III - THE TRIAL JUDGE ERRED IN VOIDING THE ENTIRE [MAY] 2015 ARBITRATION AGREEMENT BASED UPON THE NEW JERSEY [UNIFORM] ARBITRATION ACT, N.J.S.A. 2A:23B-1 [TO -32.]
>
> POINT IV - THE DOCUMENTARY EVIDENCE DEMONSTRATES DEFENDANT . . . CAUSED MULTIPLE DELAYS IN WINDING DOWN THE CORPORATIONS AND IS THUS GUILTY OF

---

[6] We have renumbered the point headings for clarity.

COMING TO THE COURT WITH UNCLEAN HANDS[.]

POINT V - THE TRIAL [JUDGE] SHOULD HAVE DENIED [DEFENDANT'S] REQUESTED RELIEF AS THERE WAS NO CONTROVERSY YET BETWEEN THE PARTIES AS TO THE MAY [] 2013 SETTLEMENT AGREEMENT[.]

Having considered the arguments and applicable law, we affirm.

The focus of the plenary hearing was the May 2015 agreement, which was entitled "settlement agreement" and established a mechanism by which the parties would select a "dispute," defined as "the net total of all debts and obligations collectively owed by a single debtor" to the companies, for which plaintiff or defendant "[would] be primarily responsible as the 'Responsible Collector.'" The "'Responsible Collector' . . . [would] devote all reasonably necessary time and efforts towards collection of the amounts owed for the matters for which he [was] responsible." Under the May 2015 agreement, "[a]ll offers of settlement of any such dispute for less than immediate payment of the full amount owed" had to be approved by both parties. If the parties could not agree, "then the dispute [would] be submitted to [Marotte] for final binding decision."

Further, pursuant to the May 2015 agreement, for debts exceeding $5000, "the Responsible Collector . . . [would] receive as a commission . . . 15% of the net amount received," less fees, costs, and offsetting payments, and

Marotte would decide "through a final binding decision" any commission-related disputes. Debts less than $5000 would "be submitted to a collection agency for collection." However, if the parties were unable to agree on a collection agency, "then [Marotte] shall make a final binding decision." If either party "believe[d] the other [was] not providing a proper level of supervision or assistance to counsel and/or a collection agency retained in a collection effort for which the other [was] responsible and eligible for a commission," was "spending more in legal fees and costs than [was] warranted by the amount at issue," or "[was] otherwise not performing his collection responsibilities with respect to a collection effort," then the dispute could be submitted to Marotte who would "make a final binding determination[.]"

The May 2015 agreement also specified that if Marotte determined there was a failure to "cooperate in good faith" by "either action or inaction," then Marotte would "provide the non-cooperating [party]" with time "to take whatever corrective action(s)" Marotte deemed necessary.

> [A]fter the end of the cure period[,] [Marotte would] make a binding final determination as to whether the non-cooperating [party] took all of those corrective actions to [Marotte's] satisfaction . . . . If [Marotte] determine[d] that [the party] failed to timely take all of those corrective actions to [Marotte's] satisfaction . . . [,] then the non-cooperating [party would] forfeit[] his right under the [May 2015] [a]greement to any equal distribution of funds collected as part of the subject collection[s] "dispute", and all of those

7

collected funds from that dispute shall instead be paid directly to the other [party] in addition to any commission that other [party] may have earned under the [May 2015] [a]greement with respect to that collection effort.

Additionally, the May 2015 agreement imposed strict time limitations to complete the actions delineated therein and provided that "[w]ith respect to each time limitation in the [a]greement, time [was] of the essence." The agreement also provided that its interpretation and enforcement was "governed under the substantive and procedural laws of the State of New Jersey." Further, "[a]ny disputes concerning th[e] [a]greement, the subject matter of th[e] [a]greement[,] or the interpretation of th[e] [a]greement shall be submitted to [Marotte] for a final and binding decision." Finally, each party acknowledged executing the May 2015 agreement "of his own free will and accord," "after receiving full advice from counsel of [his] own selection,"[7] and "understand[ing] the terms and conditions of th[e] agreement."

At the hearing, plaintiff testified about the circumstances under which the May 2015 agreement was entered, explaining that the parties had appeared on May 28, 2015, for a scheduled arbitration hearing before the three-person panel as prescribed in the May 2013 agreement. According to plaintiff, one of the issues he intended to present for arbitration was the need to "start

---

[7] Each party was represented by independent counsel.

collecting money owed to [the companies,]" amounting to "several million dollars." Although the three-person panel had addressed collection issues in the past, instead of proceeding with the scheduled arbitration hearing, the parties spent "the entire day" negotiating and drafting the May 2015 agreement to specifically address the collection disputes.

According to plaintiff, the only reason they entered into the May 2015 agreement was "[t]o find a less expensive way to handle all the collection issue[s] and to do it in an easier or faster fashion than going through the three-[person] arbitration panel."[8] In responding to specific questions regarding whether the May 2015 agreement was a settlement agreement or an arbitration agreement, plaintiff was vague and equivocal. Although plaintiff acknowledged that there were three prior drafts before the parties agreed on the final version, he had no recollection of the word "arbitrator" appearing in the prior drafts, and was "not sure" whether the final version of the six-page agreement they ultimately agreed upon identified Marotte as an "arbitrator."

Plaintiff testified Marotte was selected as the decision maker in the May 2015 agreement because he was "the neutral arbitrator" on the three-person

---

[8] Specifically, plaintiff explained that while the three-person panel billed collectively at a rate of $1800 per hour, an individual arbitrator would only cost $600 per hour, and scheduling one arbitrator would be much easier than scheduling three arbitrators, the parties, and their respective counsel.

panel, and he had been "the corporate counsel for the compan[ies] for about ten years[.]" Plaintiff acknowledged that, unlike the arbitration agreement, a mechanism to replace Marotte if he was unable or unwilling to serve under the May 2015 agreement "was never discussed." Likewise, "[t]here was no discussion" that "[Marotte] was the only person who was capable of deciding a dispute."

Plaintiff denied that the entire May 2015 agreement was based on the fact that Marotte would act as the decision maker, and stated he would not have signed the May 2015 agreement if he believed that it could be voided if Marotte was unable to serve. Plaintiff did not believe that Marotte had any "[u]nique knowledge" of the companies' collection matters that would prevent any other individual from serving as his replacement. In fact, according to plaintiff, Marotte only "knew . . . a very small percentage" of "[t]he companies['] . . . hundreds of clients[,]" and there were other attorneys with whom plaintiff had a similar long-standing relationship. Plaintiff's understanding was that any attorney or retired judge could serve as the decision maker "[i]f something happened to . . . Marotte[.]"

Plaintiff explained his intention in entering into the agreement, stating that "[they] had already been trying for over two years, in some instances, four or five years[,] to collect money from debtors," but defendant had

"obstruct[ed]" the process. According to plaintiff, the "new agreement on how to handle the process of collecting money" allowed them to move forward in an expeditious and cost-effective manner. Although plaintiff acknowledged terminating Marotte from the three-person panel, he denied knowing why Marotte resigned as the decision maker under the May 2015 agreement, and claimed that Marotte's resignation had nothing to do with the termination.

In contrast, defendant believed the May 2015 agreement was a settlement agreement, not an arbitration agreement. Initially, defendant was not agreeable to all the terms in the final version of the May 2015 agreement. However, he relented because Marotte was going to be the decision maker and that "was the most significant issue" to him. He wanted Marotte to be the sole decision maker because "[Marotte] had been general [c]ounsel for [their] companies for a number of years." Additionally, Marotte "had assisted [them] in numerous activities[,]" and "had been on many, many, many phone calls involving both [parties] . . . individually."

Based on that relationship, defendant believed Marotte had specialized knowledge about the parties and the companies that no other attorney possessed. Because defendant "felt that it would be beneficial both to [him] and to the compan[ies] if [Marotte] was the decision maker," he "was willing to give up on some of the other items for [Marotte] specifically to be there and

to stay on board." Unlike plaintiff, defendant testified that "[he] would not have entered into th[e] agreement[] if . . . Marotte was not the decision maker." He believed that if Marotte was unable to serve as decision maker, the agreement "would be voided" and they would revert back to the May 2013 agreement, which encompassed "any wind[-]down disputes" between the parties. According to defendant, he signed the May 2015 agreement because it specifically named Marotte as the decision maker, and, unlike the May 2013 agreement, did not provide for any replacements.

Defendant acknowledged that since the May 2015 agreement was executed, he had not collected any monies as the Responsible Collector while plaintiff had. Defendant also acknowledged that to date, plaintiff had not received any commissions for those matters. Further, defendant admitted that if the May 2015 agreement was voided and the parties relied on the May 2013 agreement to resolve their disputes, the Responsible Collector would not be entitled to a commission because the May 2013 agreement made no such provision.

Following the hearing, the judge issued an oral decision, declaring the May 2015 agreement null and void. As a result, plaintiff's request to appoint a replacement for Marotte as the decision maker under the May 2015 agreement was denied. In his decision, the judge found the following facts:

The parties here entered into two separate and distinct agreements. The first agreement, identified on its face as a settlement agreement term sheet, was entered into on May 2[], 2013. This agreement specifically called for binding arbitration and set forth procedures for the selection of arbitrators and provided for the procedure to replace the neutral arbitrator who, . . . in this case was Michael Marotte.

This term sheet was formalized on March 16[], 2015[,] in a document entitled arbitration agreement.[9] This agreement, drafted on . . . Marotte's firm's letterhead spelled out in detail the procedures to follow in arbitrating the seemingly intractable disputes between . . . plaintiff and . . . defendant.

. . . [T]he arbitration law was specifically mentioned and made part of this agreement. [Seventy-three] days later on May 28[], 2015[,] a second agreement was entered into between the parties. This agreement was also drafted on Marotte's firm's letterhead and was entitled settlement agreement. The apparent objective of this agreement was to carve out from the March[] 2015 arbitration agreement certain issues and to have Marotte be the sole and ultimate decider.

Conspicuously, nowhere in the [May 2015] agreement is the word arbitration mentioned . . . nor is there any specific agreement for arbitration. This agreement was to handle specifically collection matters that existed and were the source of conflict between the two principals.

---

9   The March 16, 2015 arbitration agreement referred to by the judge superseded the August 8, 2013 arbitration agreement that ratified and effectuated the May 2013 agreement.

> [I]n August[] 2017[,] . . . plaintiff terminated Marotte as the neutral arbitrator under the [arbitration] agreement. Marotte thereafter withdrew from . . . the May[] 2015 agreement[, which] . . . . was silent on the procedure for replacing Marotte . . . .

The judge posited that "[t]he issue before the [c]ourt [was] whether it should rework the [May 2015] agreement and provide . . . a substitute for Marotte or declare the agreement void under the legal principles of impossibility of performance . . . and/or frustration . . . of purpose." In making the determination, the judge evaluated the parties' intent in entering the May 2015 agreement thusly:

> [Plaintiff] testified essentially there was no specific intention with respect to the selection of Marotte. He portrayed Marotte as one of a myriad of attorneys who had worked for the parties and brought no special expertise to the project. He indicated that the purpose of the May[] 2015 agreement was essentially to save fees . . . that would have been incurred if the arbitration process as set forth in the [arbitration] agreement was followed.
>
> He testified that it took a better part of a day to draft and negotiate the May accord and various drafts were prepared. Unlike the prior agreement between the parties, . . . no specific provisions were made to substitute Marotte in the event he was unable to discharge his duties under the May[] 2015 agreement.
>
> Despite [plaintiff's] attempt to minimize Marotte's prior business relationship between the parties, he did concede that Marotte had worked with the parties for ten years and fulfilled the role of corporate counsel. He was familiar with the

14

companies, its principals, and the debts and accounts receivable, which were the focal point of the May[] 2015 agreement. [Plaintiff's] efforts to downplay Marotte's unique knowledge about the parties and the relationship to the parties were not credib[le].

[Defendant's] testimony, not surprisingly, differ[ed] from [plaintiff's]. He pointed out that Marotte had been involved with the companies they owned and had been involved in the present dispute since 2013 when the initial term sheet of settlement was executed. Per [defendant], Marotte had spent numerous hours working with both principals. In his view[,] Marotte had specialized knowledge about the individuals, the companies, and the companies' business transaction[s]. It was Marotte, according to [defendant], who suggested the carve-out of the collection matters that was the subject of the May[] 2015 agreement.

The procedure set forth in [the May 2015] agreement departed significantly from the procedures previously negotiated by the parties in the course of their prior conduct. Per [defendant], without Marotte[,] there would be no [May] 2015 agreement.

The judge determined that "New Jersey case law require[d] the [c]ourt to give the May[] 2015 agreement its plain and ordinary meaning[,] thus respecting the parties' intent to designate Marotte as the sole decision maker and deliberately omitting a mechanism for replacing Marotte." Applying the applicable legal principles, the judge concluded that Marotte's withdrawal "from the [May] 2015 agreement, which followed his discharge from the [arbitration] agreement by [plaintiff]," "substantially negated and frustrated"

"the intent of the parties" because "his selection and participation in the May[] 2015 agreement was the most significant factor that . . . produced that agreement."

The judge elaborated:

> [Marotte] possessed unique knowledge and experience with the parties and their disputes. The May[] 2015 agreement was specifically carved out from the [arbitration] agreement, which was equipped to handle collection issues within the framework of the . . . agreement. A separate procedure was intended with respect to collection matters and Marotte's participation was a critical part of this agreement.
>
> The May[] 2015 agreement was completely void of any mention of arbitration or invocation of the arbitration law. Where a party's principal purpose is substantially frustrated without his fault[,] the party's remaining duties are discharged unless the language or circumstance indicate to the contrary. . . . There is a basic principle of contract law that the [c]ourt cannot rewrite the terms of the agreement. The [c]ourt's role is to discern the parties' intent.
>
> The [c]ourt is fully cognizant that this type of relief should not be lightly granted. . . . The [c]ourt is satisfied that the evidence after considering the testimony is clear and convincing that Marotte was an integral part of the [May 2015] agreement and his withdrawal frustrated the intent and purpose of the parties and, therefore, the May[] 2015 agreement should be declared null and void under the principles of frustration [of] purpose and impossibility of performance.
>
> This means that the parties are relegated to their [arbitration] agreement to resolve what appears to be

their intractable disputes. They are free to draw up a new agreement to deal with collections if they so desire.

The judge entered a memorializing order and this appeal followed.

Plaintiff argues that "based upon well-settled principles of contract interpretation law, the language of the [May] 2015 [a]greement demonstrates that the trial judge erred [in] voiding the [May] 2015 [a]greement in its entirety." According to plaintiff, in voiding the agreement, the judge ignored the agreement's provision that "expressly precluded any modification or amendment . . . except through the execution of a written instrument[,]" and disregarded the "severability clause" that allowed "the remaining portions" of the agreement to "remain in full force and effect" in the event "any part or portion . . . shall be held to be illegal, unenforceable[,] or contrary to . . . public policy."

Additionally, plaintiff contends that "[b]y accepting [defendant's] testimony . . . that without . . . Marotte[] . . . , it was impossible to carry out the [May] 2015 [a]greement when no such language was contained in the [May] 2015 [a]greement, the trial court relied upon impermissible parol[] evidence as its basis to void the [May] 2015 [a]greement in its entirety." Plaintiff continues that since "[t]he [May] 2015 [a]greement was put in place . . . to prevent and minimize future conflicts[,] . . . cancelling it goes against

17

the intent of the [a]greement." Moreover, according to plaintiff, "the [May] 2015 [a]greement was not merely an agreement to arbitrate claims, it was expressly identified as a settlement agreement between the parties" and "[s]ettlement of litigation ranks high in our public policy."

We agree that there is a strong public policy favoring settlement of litigation, Nolan v. Lee Ho, 120 N.J. 465, 472 (1990), and we "strain to give effect to the terms of a settlement wherever possible." Brundage v. Estate of Carambio, 195 N.J. 575, 601 (2008) (quoting Dep't of Pub. Advocate, Div. of Rate Counsel v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)). Because the "[i]nterpretation of a settlement agreement implicates significant legal and policy principles, . . . the standard for vacating a settlement is not easily met." Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009) (citing Nolan, 120 N.J. at 472). Thus, "[b]efore vacating a settlement agreement, our courts require 'clear and convincing proof' that the agreement should be vacated." Nolan, 120 N.J. at 472 (quoting De Caro v. De Caro, 13 N.J. 36, 42 (1953)).

Equally well-settled is the principle that a settlement agreement between parties is a contract governed by basic contract principles, ibid., and, "absent a demonstration of 'fraud or other compelling circumstances,'" a court should enforce a settlement agreement as it would any other contract. Jennings v.

18                                                                                    A-1948-17T4

Reed, 381 N.J. Super. 217, 227 (App. Div. 2005) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983)). Among the contract principles applicable to settlement agreements "are that courts should discern and implement the intentions of the parties[,]" and not "rewrite or revise an agreement when the intent of the parties is clear." Quinn v. Quinn, 225 N.J. 34, 45 (2016). "Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Ibid. "To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent." Ibid.

A contract is ambiguous if its terms are "susceptible to at least two reasonable alternative interpretations." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. 275, 283 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993)). When a contract is ambiguous in a material respect, the parties must be given the opportunity to illuminate the contract's meaning through the submission of extrinsic evidence. Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-70 (2006). While extrinsic evidence should never be permitted to modify or curtail the terms of an agreement, a court may "consider all of the relevant

evidence that will assist in determining the intent and meaning of the contract" in attempting to resolve ambiguities in the document. Id. at 269.

As the Court explained in Conway,

> [e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.
>
> [Ibid. (alteration in original) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02 (1953)).]

The "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review." Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 190 (App. Div. 2008) (quoting Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998)). Thus, we accord no special deference to a trial court's interpretation of an agreement entered into by the parties. Kaur, 405 N.J. Super. at 474. However, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence[,]" and "[d]eference is especially appropriate when the evidence is largely testimonial and involves questions of credibility."

Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

With these principles in mind, we review the judge's determination to void the May 2015 agreement, which constitutes the crux of this appeal. In voiding the agreement, based on the testimony of the parties as well as the terms contained within the four corners of the agreement, the judge determined that Marotte's selection and participation as the decision maker "was the most significant factor that . . . produced [the May 2015] agreement." Based on Marotte's "unique knowledge and experience with the parties and their disputes[,]" the judge found that "[his] participation was a critical part of [the May 2015] agreement."

Because there was no provision in the May 2015 agreement for the selection of a replacement, as contained in the May 2013 agreement, the judge concluded that Marotte's resignation rendered performance of the May 2015 agreement impossible and frustrated the purpose of the agreement. We are satisfied that the judge's factual findings are fully supported by the record and, in light of those facts, his legal conclusions are sound. Contrary to plaintiff's assertion, the judge did not void the May 2015 agreement by revising the agreement to add a requirement that Marotte's participation was indispensable. Instead, the judge determined that the evidence adduced at the hearing

21

demonstrated that Marotte's resignation rendered the performance of the agreement impossible and frustrated the purpose of the May 2015 agreement.

"The respective concepts of impossibility of performance and frustration of purpose are, in essence, doctrinal siblings within the law of contracts." JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, 431 N.J. Super. 233, 245 (App. Div. 2013).

> Both doctrines may apply to certain situations in which a party's obligations under a contract can be excused or mitigated because of the occurrence of a supervening event. The supervening event must be one that had not been anticipated at the time the contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship.
>
> [Ibid.]

Indeed, "[b]oth the impossibility and frustration doctrines are concerned with '[a]n extraordinary circumstance [that] may make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance.'" Ibid. (second, third, and fourth alterations in original) (quoting Restatement (Second) of Contracts, ch. 11, intro. note at 309 (Am. Law. Inst. 1981)). "The doctrines stem from the concept of an implied condition within a contract." Ibid. "[T]he concept is that a contract is to be considered 'subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting

the fundamental basis of the contract ceases to exist without default of either of the parties.'" Id. at 245-46 (alteration in original) (emphasis omitted) (quoting A-Leet Leasing Corp. v. Kingshead Corp., 150 N.J. Super. 384, 397 (App. Div. 1977)).

Frustration of purpose arises when "the obligor's performance can still be carried out, but the supervening event fundamentally has changed the nature of the parties' overall bargain." Id. at 246. "The frustration must be so severe that it is not fairly to be regarded as the risks that [the party invoking the doctrine] assumed under the contract." Id. at 247 (alteration in original) (quoting Restatement (Second) of Contracts § 265 cmt. a). Relief from performance of contractual obligations on the theory of frustration of purpose "will not be lightly granted; the evidence must be clear, convincing[,] and adequate." A-Leet Leasing Corp., 150 N.J. Super. at 397. By comparison, under the related doctrine of impossibility or impracticability of performance, a party is excused from having to perform his contract obligations "where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties." JB Pool Mgmt., 431 N.J. Super. at 246.

A-1948-17T4

Here, we agree with the judge's finding that there was clear and convincing evidence of frustration of purpose and impossibility of performance. The supervening event of Marotte's unavailability as the decision maker fundamentally changed the nature of the parties' overall bargain and rendered performance under the May 2015 agreement impossible. Based on the contentious and acrimonious relationship of the parties, undoubtedly, collection disputes would abound, thus necessitating a procedure for their amicable resolution. Because Marotte was responsible for definitively deciding those disputes, including issues related to the selection of debts, approval of settlement offers, commissions earned, collection efforts, and bad faith, as well as deciding issues related to the subject matter and interpretation of the May 2015 agreement itself, his unavailability frustrated the nature of the parties' overall bargain and rendered performance of the contract obligations impossible. Further, based on the judge's fact-findings, which are supported by the record, the unavailability of Marotte as the decision maker was not a risk defendant assumed under the contract, nor was it contemplated by the parties, as evidenced by the fact that a replacement decision maker was never addressed as in the May 2013 agreement.

Plaintiff argues that based on the severability clause, the provisions within the May 2015 agreement that were unaffected by the identity of the

decision maker could have been severed from the agreement, and any disputes arising from those provisions could have been decided by a third party or the court. However, "[s]everability is only an option if striking the unenforceable portions of an agreement leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 437 (App. Div. 2011). That is not the case here.

We also reject plaintiff's contention that the judge relied upon impermissible parol evidence as the basis for voiding the May 2015 agreement. "In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document." Conway, 187 N.J. at 268. However, the rule excludes testimony "only when it is offered for the purpose of 'varying or contradicting' the terms of an 'integrated' contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms[,]" as occurred here. Atl. N. Airlines, Inc., 12 N.J. at 302 (quoting 3 Corbin on Contracts, § 579 (1951)).

Plaintiff also argues that because the May 2015 agreement was a "carve out" from the May 2013 agreement, as acknowledged by the judge, the agreements must be read in conjunction with each other. Where "two documents were separate pieces of paper but it was obvious . . . that they were

interrelated parts of a single transaction[,]" the documents are treated as a unitary contract.  <u>Gen. Inv. Corp. v. Angelini</u>, 58 N.J. 396, 400 (1971); <u>see also</u> <u>In re Resnick</u>, 284 N.J. Super. 47, 60 (App. Div. 1995) (explaining that because decedent's will and attendant contract refer to one another and are closely related, the two documents "must be read <u>in pari materia</u>").  However, the May 2015 agreement makes no reference to the May 2013 agreement. Instead, unlike the May 2013 agreement, which provided for a three-person panel to settle "wind-down" disputes between the parties, the May 2015 agreement created a stand-alone mechanism for handling collection disputes by having Marotte serve as the sole final decision maker.

Plaintiff further argues that the judge erred in preventing Marotte from testifying at the hearing.  Plaintiff asserts that had "Marotte been allowed to testify," the "judge would not have found [plaintiff's] testimony" lacked credibility "and a vastly different decision" would have been made.  In support, plaintiff relies on Marotte's deposition testimony to show Marotte's personal knowledge of the parties' intent in entering into the May 2015 agreement.[10]

---

[10]  Although plaintiff's appendix includes a copy of the deposition transcript, the transcript was never submitted to the judge or moved into evidence at the hearing.  Our Supreme Court has cautioned against "consider[ing] . . . deposition testimony that was not presented to the trial court and that was

(continued)

Prior to the hearing, the judge issued an order specifying that the sole issue at the hearing would be "the parties' state of mind and intent[] when they entered into the May 2015 [a]greement and selected . . . Marotte to resolve the outstanding collection disputes[.]"  At the beginning of the hearing, the judge reiterated his position and noted that although Marotte "s[a]t for a deposition[,]" he did not have to do so because the court "did not order nor . . . require any additional discovery."  During the hearing, when Marotte arrived in the courtroom, the judge informed him that his testimony was not needed.

"[C]ontrol[ling] and manag[ing] the introduction of testimony" is within the discretion of the trial court, Hall v. St. Joseph's Hosp., 343 N.J. Super. 88, 107 (App. Div. 2001), and "[its] decision . . . [is] conclusive unless clearly erroneous as a matter of law."  Bosze v. Metro. Life Ins. Co., 1 N.J. 5, 10 (1948).  Here, we are satisfied the judge did not abuse his discretion.  See N.J.R.E. 403 ("relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue delay, waste of time, or

_____

(continued)
submitted by the parties for the first time on appeal."  Townsend v. Pierre, 221 N.J. 36, 45 n.2 (2015); see also Harris v. Middlesex Cty. Coll., 353 N.J. Super. 31, 48 (App. Div. 2002) (striking "the materials in plaintiff's appendix that were not included in the record below," and "not consider[ing] them in th[e] decision").  Although we will not strike the transcript from plaintiff's appendix, our decision on this issue does not require us to consider the deposition testimony.

A-1948-17T4

needless presentation of cumulative evidence"). However, even assuming he did, it was harmless error, see Rule 2:10-2, because we are hard-pressed to conclude that the excluded testimony would be more probative of the parties' intent in entering into the May 2015 agreement than the testimony of the parties themselves. Thus, the exclusion of Marotte's testimony does not constitute grounds for reversing the judge's decision as it is not "of such a nature as to have been clearly capable of producing an unjust result[.]" Ibid.

Next, plaintiff argues "that the New Jersey [Uniform] Arbitration Act applies to the [May 2015 agreement]" and "authorized the trial court to appoint a substitute [arbitrator]" if "Marotte[] [was] 'unable to act' to resolve the parties' collection issues." We disagree.

"[T]he issue of whether parties have agreed to arbitrate is a question of law that is reviewed de novo." Jaworski v. Ernst & Young U.S. LLP, 441 N.J. Super. 464, 472 (App. Div. 2015). "[I]t is equally true that the duty to arbitrate, and the scope of the arbitration, are dependent solely on the parties' agreement." Cohen v. Allstate Ins. Co., 231 N.J. Super. 97, 101 (App. Div. 1989). "Thus, '[i]n the absence of a consensual understanding, neither party is entitled to force the other to arbitrate their dispute'" and "[s]ubsumed in this principle is the proposition that only those issues may be arbitrated which the parties have agreed shall be." Quigley v. KPMG Peat Marwick, LLP, 330 N.J.

Super. 252, 271 (App. Div. 2000) (first alteration in original) (quoting In re Arbitration Between Grover & Universal Underwriters Ins. Co., 80 N.J. 221, 228-29 (1979)).

Here, as the judge astutely pointed out, unlike the May 2013 agreement or the corresponding March 2015 arbitration agreement executed only seventy-three days prior, absent from the May 2015 agreement was "the word arbitration," "any specific agreement for arbitration[,]" or the "invocation of the arbitration law." Moreover, there was no arbitration mechanism, no arbitration panel, and Marotte was not identified as an arbitrator, but rather as the individual responsible for making "a final and binding determination." Thus, it is abundantly clear that the May 2015 agreement was not an arbitration agreement governed by the Act.

On the other hand, the May 2013 agreement explicitly provided that disputes would "be submitted to binding arbitration" to the three person panel and, in the event the neutral third arbitrator "withdr[e]w" or was "dismiss[ed]," "each party's representative [arbitrator] shall meet and choose a neutral third arbitrator." Although the corresponding March 2015 arbitration agreement, to which the judge relegated the parties, made no express provision for the replacement of the neutral third arbitrator, its provisions "set[] forth the terms and conditions of the binding arbitration" to which the parties "both agreed to

participate" "pursuant to the [May 2013 agreement]." Because the arbitration agreement refers to and effectuates the May 2013 agreement, the two documents "were interrelated parts of a single transaction[,]" Angelini, 58 N.J. at 400, and "must be read in pari materia." Resnick, 284 N.J. Super. at 60.

Plaintiff argues further that given the "overwhelming evidence that [defendant was] a wrongdoer with respect to the [May] 2015 [a]greement[,]" "pursuant to the unclean hands doctrine, the trial court erred in voiding the [May] 2015 [a]greement in total and by denying [plaintiff's] requested relief." The equitable doctrine of unclean hands grants discretion to a trial court to refuse relief to one who is a wrongdoer with respect to the subject matter of the suit, Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001), and requires that "[a] suitor in equity must come into court with clean hands and . . . keep them clean after his entry and throughout the proceedings." Ibid. (first alteration in original) (quoting A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949)). Thus, the doctrine of unclean hands is applied against a person bringing a claim in equity to bar "the special remedies of equity," but "does not deny legal rights, or foreclose a defense by a defendant brought into equity." Merchs. Indem. Corp. v. Eggleston, 37 N.J. 114, 132 (1962).

Here, the "suitor" in equity is plaintiff, not defendant. Plaintiff filed a verified complaint and order to show cause, seeking equitable relief through the appointment of a replacement for Marotte in the May 2015 agreement. Thus, the doctrine of unclean hands is inapplicable as it does not "foreclose a defense by a defendant brought into equity." Ibid.

To the extent we have not specifically addressed a particular argument or any of plaintiff's remaining arguments, it is because either our disposition makes it unnecessary or the argument is without sufficient merit to warrant discussion in a written opinion.[11] R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] For example, plaintiff argues the judge should have denied defendant's counterclaim for a declaratory judgment. The judge, in fact, dismissed the counterclaim, and that decision has not been appealed.

A-1948-17T4