**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3835-18T2

IN THE MATTER OF MARILYN
NIPPES, an Incapacitated Person.

Argued telephonically May 7, 2020 –
Decided July 9, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000448-16.

Barbara A. Nippes, appellant, argued the cause pro se (Lawrence Bluestone, on the briefs).

Michael J. Canning argued the cause for respondent Scott Napolitano (Giordano, Halleran & Ciesla, attorneys; Michael J. Canning, of counsel and on the brief).

PER CURIAM

Appellant Barbara A. Nippes[1] appeals from a March 22, 2019 Probate Part order approving a partial settlement and denying, on procedural grounds, her cross-motion for the removal of a court-appointed guardian of the property of Marilyn Nippes, Barbara's mother. A May 15, 2018 consent judgment declared Marilyn an incapacitated person (Consent Judgment). Barbara also appeals the Probate Part's May 3, 2019 order, approving the final aspect of the settlement with a third defendant. For the reasons that follow, we affirm.

In 1980, Marilyn, along with her late husband Paul, founded Magnetic Products & Services, Inc. (MPS). The company distributes a groundbreaking portable lightweight machine created by Paul that controls, reduces, or eliminates residual magnetism in certain materials.

In 2013, MPS sued former employees and consultants for misappropriation of trade secrets (IP litigation). A parallel proceeding was initiated in federal court but stayed pending the outcome of the state case. The named plaintiff alleged defendants stole MPS's design, creating a competing company to sell a similar product. MPS's expert report calculated the company

---

[1] We refer to the parties by their first names in order to distinguish between family members. No disrespect is intended by the usage.

suffered nearly $2.5 million in damages from defendants' wrongful actions and added $1.3 million as fees and costs to that figure.

Marilyn was MPS's chief financial officer and became the sole stockholder in the company following Paul's death. In 2016, Marilyn's daughter Pamela filed the complaint for guardianship, which resulted in the 2018 Consent Judgment. Barbara was appointed Marilyn's guardian of the person, while Scott Napolitano, MPS's accountant, was appointed guardian of her property. It was Napolitano who sought approval of the settlement terms and who Barbara sought to remove.

After the initiation of Marilyn's guardianship proceeding, the Probate Part appointed Michael Canning, Esquire, as temporary guardian. In a report to the court discussing the Nippes family's positions on the status of the IP litigation, he indicated that Elizabeth and Pamela, Barbara's sisters, both identified Barbara as the driving force behind the litigation. Elizabeth and Pamela were concerned about litigation expenses, while Barbara, although cognizant of the legal fees, strongly supported the litigation. Unsurprisingly, Marilyn, who is incapacitated, was not aware of the amount of fees and was confused as to the litigation's status.

In 2013, years before Pamela initiated the guardianship proceeding, but shortly after the IP litigation was filed, the family met to discuss a potential

settlement. Because Barbara wanted the IP litigation to continue, and represented that Marilyn did not want to settle, it proceeded for over three years funded with money from the company and from Marilyn's accounts.

Canning, on the other hand, recommended that the matter be resolved by way of settlement, if possible, within a certain budget. Settlement was a major focus of the activities engaged in by the attorneys handling the litigation.

After his appointment, Napolitano also engaged in vigorous settlement efforts. Eventually, the defendant company agreed to pay $300,000 in four installments, redesign its own machine without use of MPS's trade secrets, pay a fifteen percent royalty on products sold during the redesign period, and not sell any infringing products in the future. An additional defendant agreed to pay $60,000 and not to use MPS's trade secrets going forward. Napolitano sought court approval of the settlement terms. In addition to opposing the settlement, Barbara cross-moved seeking Napolitano's removal.

The relevant paragraphs of the Consent Judgment, which controlled the trial judge's decision as well as our own, state:

> [Paragraph seven]
> Scott G. Napolitano shall serve as Guardian of the property in connection with all aspects of the Estate of Marilyn Nippes, with the exception of decisions affecting Magnetic Products and Services, Inc. ("MPS"). Any decisions affecting MPS, except for

decisions related to day to day operations [sic], shall be guided by an advisory panel consisting of Barbara Nippes, Pamela Brittingham and Elizabeth Galano (the "Sisters.") The Sisters shall confer on a monthly basis to discuss and decide any such decisions affecting MPS by a majority vote. Any decisions voted by the Sisters shall be recommended to Scott G. Napolitano for action, at which Scott G. Napolitano will be guided, but not bound, by such recommendation. Any material decisions affecting MPS shall require a unanimous vote among the Sisters. In the event of a disagreement among the Sisters regarding a decision requiring a unanimous vote, the Sisters shall agree to resolve the dispute by binding arbitration. If any of the Sisters intends to begin an arbitration to resolve the lack of unanimous vote, such Sister shall provide written notice (the "Arbitration Request") to the other Sisters of such intention and a statement of the dispute.

. . . .

[Paragraph ten]
GUARDIAN LIMITATIONS: If applicable, the authority of the guardian(s) is limited as follows, and all limitations shall be stated in the Letters of Guardianship. The Guardian(s) of the Property, Scott G. Napolitano, may not alienate, mortgage, transfer or otherwise encumber or dispose of real property and/or shares of stock in MPS and may not terminate a litigation pending in Union County entitled Magnetic Products and Services, Inc. v. Demag Solutions, LLC, et al., UNN-C-89-13 and the Federal Copyright Case, without court approval.

Pamela and Elizabeth supported the terms of the proposed settlement. In a certification, Pamela stated four different law firms had recommended that

5

they settle the IP litigation. Napolitano's position is that the monetary damages reflect the financial resources of the defendants, although obviously less than the expert's estimate of damages. Settlement would stop the substantial expenditure of legal fees and costs. Barbara asserts that Marilyn opposes settlement, and that it is a waste of time and money to pursue it given the very strong likelihood of success at trial. Barbara did not believe the settlement terms were fair. She further objected to the fact that Napolitano did not seek to ascertain Marilyn's view on the litigation, and did not go through the process she alleged was necessary before a final settlement could be reached—binding arbitration among the sisters pursuant to paragraph seven of the Consent Judgment.

Having considered the moving papers and heard oral argument on the motions, the judge, the same person who signed the Consent Judgment, applied ordinary rules of construction to the interpretation of the two paragraphs. She opined the language was plain and unambiguous, and that Barbara's suggested enforcement of the arbitration language in paragraph seven would render the language of paragraph ten superfluous. She characterized the inherent logic of her decision as mirroring the logic of the agreement, including that paragraph ten governed the issue of the termination of the IP litigation. The lengthy

process of arbitration, complete with discovery and hearings, would require "a mini trial" which would delay and make superfluous any court approval of a settlement. The judge further observed that the IP litigation was difficult, highly technical, and the settlement extracted a lifetime injunction from a defendant. Although the damages were substantially less than just the legal fees already paid, given defendants' financial resources, they were realistic. Thus, the judge held that arbitration was not necessary before the court acted on Napolitano's application. The second order merely approved the settlement agreement with a different IP litigation defendant, and the judge did so for the same reasons as stated when she approved the initial settlement. The court denied the cross-motion for removal of Napolitano on the basis it was procedurally improper, and should have been pursued under N.J.S.A. 3B:12-24 and Rule 4:86.

By way of appeal, Barbara raises the following points:

> I. THE TRIAL COURT ERRED IN DENYING BARBARA'S CROSS-MOTION FOR REMOVAL OF THE GUARDIAN OF THE PROPERTY UNDER RULE 4:86-7 ON PROCEDURAL GROUNDS.
>
> II. THE TRIAL COURT'S APPROVAL OF THE SETTLEMENT AGREEMENTS WAS PROCEDURALLY AND SUBSTANTIVELY FLAWED.
>
> A. The Trial Court Misinterpreted the Consent Judgment.

A-3835-18T2

B. The Approval of the Settlement Agreements Was Substantively Flawed Because the Trial Court Ignored Evidence Regarding the Guardian's Failure to Properly Follow the Requirements of the Consent Judgment, Including the Requirement to Consult with His Ward.

I.

The parties dispute the relevant standard of review. Barbara urges us to apply a de novo standard, while Napolitano urges a deferential de novo standard. Napolitano contends federal caselaw supports the position that a trial court's interpretation of its own consent judgment is owed deference by a reviewing court.

A consent judgment is both a judicial decree and a contract—"it is not strictly a judicial decree, but rather in the nature of a contract entered into with the solemn sanction of the court." Cmty. Realty Mgmt., Inc. for Wrightstown Arms Apartments v. Harris, 155 N.J. 212, 226 (1998) (quoting Stonehurst at Freehold v. Township Comm., 139 N.J. Super. 311, 313 (Law. Div. 1976)). Defined differently, a consent judgment is "an agreement of the parties under the sanction of the court as to what the decision shall be." Ibid.; see also DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009) ("Indeed, a consent judgment 'is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable

to other judgments and decrees.'") (quoting Rufo v. Inmates of the Suffolk Cty. Jail, 502 U.S. 367, 378 (1992)).  Contract principles apply to a consent judgment, and it is treated as a quasi-contract.  See Harris, 155 N.J. at 226.

In Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009), we held that interpretation of a settlement agreement was subject to de novo review.  While not a consent judgment, the court there relied on the well-known adage that "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Ibid. (quotations omitted).  Given the similarity to a contract, interpretation of a consent judgment should be reviewed de novo.  Cf. Capparelli v. Lopatin, 459 N.J. Super. 584, 605 (App. Div. 2019).

## II.

We agree with the trial court that Barbara's interpretation of the Consent Judgment—that the sisters must proceed to binding arbitration before seeking court approval of the settlement—renders the terms of paragraph ten superfluous.  This is especially true given that Barbara's arguments revolve around the terms of the settlement itself, not the decision to settle in the first place.  Her concern was that the compensation defendants would pay was grossly inadequate in light of the harm done.  She was also of the opinion that

Marilyn's wishes should be consulted. Thus, our discussion is limited to Barbara's challenge to the terms of the settlement agreement.

The terms of the settlement agreement, as described by Napolitano at the time the trial judge issued her March decision, seem realistic given the nature of the defendants. $360,000 is significantly less than the alleged damages, but MPS's own law firm concluded that "none of the Defendants have any significant assets which could be used to satisfy a large judgment against them." Obviously, the collection of a judgment equivalent to the millions of dollars alleged would only lead to further litigation costs, and a further drain on the incapacitated ward's assets. That assumes that MPS prevailed at trial. A modest settlement with defendants who each have limited resources, but who agree to being enjoined from future use of the property at issue, is eminently reasonable.

Barbara contends that by failing to ascertain Marilyn's views, Napolitano failed in his duty as guardian. The issue should be addressed if Barbara files a new application to remove him. The argument goes to Barbara's concern regarding his fulfillment of his role and is best left for resolution on another day.

III.

Rule 4:86-7(c) states that "an interested person on [an incapacitated person's] behalf, may seek review of a guardian's conduct and/or review of a

guardianship by filing a motion setting forth the basis for the relief requested." A cross-motion, specifically, "may be filed and served by the responding party . . . only if it relates to the subject matter of the original motion . . . ." R. 1:6-3(b).

Here, the trial court determined that Barbara's cross-motion to remove Napolitano as the guardian of the property was procedurally deficient, in violation of N.J.S.A. 3B:12-24 and Rule 4:86-1. However, it is clear that Rule 4:86-7(c) allowed Barbara to file the cross-motion; the issue is whether the cross-motion to remove Napolitano relates to Napolitano's motion to approve the settlement.

Barbara's cross-motion to remove Napolitano does not relate to the motion to approve the settlements. Napolitano sought the court's approval on the exact terms of the settlement agreements. At the March 22 hearing, Barbara's attorney made vague allegations as to Napolitano's conduct that were not at all related to the terms of the settlement agreements. He implied that Napolitano was not providing access to "information" and claimed he was not "neutral." He also implied that Napolitano had not ascertained Marilyn's wishes as to the IP litigation, and failed to provide adequate notice or the "opportunity to go through things before they're discarded." However, Barbara makes no attempt to expound on these allegations, and the record does not support her allegations.

A-3835-18T2

Nonetheless, her complaints relate to the process leading to the settlements, not the resolution of the litigation. Her cross-motion was not related to Napolitano's motion. Therefore, the trial court was correct to deny it on procedural grounds.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12